# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF RHODE ISLAND

MICHAEL P. O'NEIL and NICOLA )
GRASSO )
)
)
Plaintiffs, )
) Civil Action No. _____
v. )
)
PETER F. NERONHA, in his Official )
Capacity as Attorney General of Rhode )
Island and COLONEL JAMES M. MANNI, )
in his Official Capacity as the )
Superintendent of the Rhode Island State )
Police )
)
)
Defendants. )
_____ )

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

COME NOW the Plaintiffs, Michael P. O'Neil and Nicola Grasso, ("Plaintiffs") by and through their undersigned counsel, and complain of the Defendants as follows:

### I.   PARTIES

1. Plaintiff Michael P. O'Neil ("O'Neil") is an adult male resident of the State of Rhode Island and resides in Warwick County and is a citizen of the of the United States.

2. Plaintiff Nicola Grasso ("Grasso") is an adult male resident of the State of Rhode Island and resides in Providence County and is a citizen of the United States.

3. Defendant Colonel James. M. Manni is the Superintendent of the Rhode Island State Police. Defendant Manni is sued in his official capacity and is responsible for the administration and enforcement of Rhode Island's customs, policies, practices and laws related to the State of Rhode Island's ban on stun guns and/or electronic arms across Rhode Island. Defendant

1

Colonel James. M. Manni may be served at Rhode Island State Police, 311 Danielson Pike, North Scituate, RI 02857.

4. Defendant Peter F. Neronha is the Attorney General of the State of Rhode Island and is sued in his official capacity and is responsible for enforcing the State of Rhode Island's customs, policies, practices and laws related to the State of Rhode Island's ban on stun guns and/or electronic arms. Defendant Neronha may be served at the Office of Attorney General located at 150 South Main Street, Providence, RI 02903.

## II. JURISDICTION AND VENUE

5. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1343, 2201, 2202 and 42 U.S.C. § 1983 and § 1988.

6. Venue lies in this Court pursuant to 28 U.S.C. § 1391.

## III. STATEMENT OF FACTS

### a. The Second Amendment

7. The Second Amendment to the United States Constitution provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms shall not be infringed."

8. The Second Amendment guarantees individuals a fundamental right to keep and carry arms for self-defense and defense of others in the event of a violent confrontation. *District of Columbia v. Heller*, 554 U.S. 570 (2008); *McDonald v. Chicago*, 561 U.S. 742 (2010); *Caetano v. Massachusetts*, 577 U.S. 1027 (2016).

9. Arms are "'weapons of offence, or armor of defense.' 1 Dictionary of the English Language 107 (4th ed.)" They are anything that a man [or woman] wears for his defense, or takes into

his hands, or uses in wrath to cast at or strike another.' 1 A New and Complete Law Dictionary (1771)." *District of Columbia v. Heller*, 554 U.S. at 581.

10. The Second Amendment extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding. *Heller,* 554 U.S. at 582; *Caetano*, slip op. at 1 (per curiam).

11. Under the Second Amendment, the Defendants retains the ability presumptively to regulate the manner of carrying arms and may prohibit certain arms in narrowly defined sensitive places, prohibit the carrying of arms that are not within the scope of Second Amendment's protection such as unusually dangerous arms, and disqualify specific, particularly dangerous individuals from carrying arms. *See Heller,* 554 U.S. at 627.

12. Given the decision in *Heller*, Defendants may not completely ban the keeping and bearing of arms for self-defense that are not unusually dangerous, deny individuals the right to carry arms in non-sensitive places, deprive individuals of the right to keep or carry arms in an arbitrary and capricious manner, or impose regulations on the right to keep and carry arms that are inconsistent with the Second Amendment. *See Caetano v. Massachusetts*, 136 S. Ct. 1027 (2016); *Heller v. District of Columbia,* 801 F.3d 264 (D.C. Cir. 2015); *Palmer v. District of Columbia,* 59 F.Supp.3d 173 (2014).

13. The Fifth Circuit has cited approvingly to *Caetano* for the proposition that stun guns are protected arms under the Second Amendment:

> In addressing whether stun guns are in common use, Justice Alito, joined by Justice Thomas, implied that the number of states that allow or bar a particular weapon is important:
>
>> [T]he number of Tasers and stun guns is dwarfed by the number of firearms. This observation may be true, but it is beside the point.... The more relevant statistic is that [200,000] ... stun guns have been sold to private citizens, who it appears may lawfully possess them in 45 States.... While less popular

3

> than handguns, stun guns are widely owned and accepted as a legitimate means of self-defense across the country.
>
> *Caetano*, 136 S.Ct. at 1032–33 (citations and quotation marks omitted). These two justices suggested that the 200,000 absolute number, plus that 45 states have "accepted [stun guns] as a legitimate means of self-defense," was enough to determine that the stun gun is in common use.

*Hollis v. Lynch*, 827 F.3d 436, 449 (5th Cir. 2016).

14. Many other jurisdictions have already found complete bans on the ownership of electric arms is unconstitutional post-*Heller*. *See People v. Yanna*, 824 N.W.2d 241, 243 (Mich. Ct. App. 2012) (striking down a Michigan statute criminalizing possession of electronic weapons), *Second Amendment Society v. Porrino*, No. 3:16-cv-04906-DEA (D.N.J. Nov. 16, 2016) Doc. No. 30 (consent decree where the Court found New Jersey's complete ban on electric arms is unconstitutional), ("Pursuant to the holdings in *Heller, McDonald and Caetano*, N.J. Stat. Ann . § 2C:39- 3(h), to the extent this statute outright prohibits, under criminal penalty, individuals from possessing electronic arms, is declared unconstitutional in that it violates the Second Amendment to the United States Constitution and shall not be enforced"); *See, Crystal Wright v. District of Columbia*, No. 1:16-cv-01556-JEB (D.D.C. Sept. 26, 2016) Doc. No. 18 (stipulating to a stay of a motion for preliminary injunction pending new legislation and agreeing not to enforce ban against plaintiffs); *Ford v. City of New Orleans*, No. 2:16-cv16433-MVL-KWR (E.D. La. Dec. 14, 2016) Doc. Nos. 17, 19-20 (stipulating that the city will not enforce the ban against plaintiff and consenting to a stay of litigation pending enactment of legislation that decriminalized possession of stun guns); *Hulbert v. Pantelides*, No. 1:16-cv-04121-JFM (D. Md. March 3, 2017) Doc. No. 16 (letter from the City of Annapolis informing the court that the City Council passed an emergency ordinance eliminating all restrictions on ownership and possession of electronic

weapons for personal defense); *Ramirez v. Commonwealth* No. SJC-12340, 2018 Mass. LEXIS 237 (Apr. 17, 2018) (striking Mass. ban on stun guns).[1]

15. Judge David N. Hurd, of the Northern District of New York, recently held that New York's ban on electric arms "… is an unconstitutional restriction on the right to bear arms[]" and that "New York's sweeping prohibition on the possession and use of tasers and stun guns by all citizens for all purposes, even for self-defense in one's own home, must be declared unconstitutional in light of [*Heller*]." *Avitabile v. Beach*, 368 F. Supp. 3d 404, 421 (N.D.N.Y. 2019).[2]

16. Additionally, the Supreme Court of Illinois found a statute banning the carry of Tasers and stun guns unconstitutional because Illinois' provision on carriage of weapons sets forth a comprehensive ban that categorically prohibits possession and carriage "… of stun guns and tasers in public." *People v. Webb*, 2019 IL 122951, ¶ 20. And, because it is a categorical ban, "… that provision necessarily cannot stand." *Id.* at ¶ 21. The Illinois Supreme Court held that the portion of the statute prohibiting "… the carriage or possession of stun guns and tasers is facially unconstitutional under the second amendment." *Id.*

17. Plaintiffs are bringing an as-applied and facial challenge to the applicable Rhode Island laws which prevent them from owning and carrying electric arms.

18. They seek an injunction preventing enforcement of the applicable Rhode Island laws against them and declaratory relief.

---

[1] Since *Caetano*, electronic arms bans in Philadelphia, Pennsylvania; Tacoma, Washington and Westminster, Maryland were also rescinded. See https://www.phillymag.com/news/2017/10/24/stun-guns-legal-philadelphia/; http://www.carrollcountytimes.com/news/westminster/ph-cc-westminster-stun-gun-ban-discussion-20170523-story.html; http://www.thenewstribune.com/news/politics-government/article158619749.html.
[2] The State of New York did not appeal Judge Hurd's ruling.

5

19. Additionally, they seek an injunction preventing enforcement of the applicable Rhode Island laws as to all other law-abiding citizens.

   **b. Stun Guns**

20. Stun guns are arms in common use for self-defense by civilians as well as by law enforcement.

21. Tasers are a type of stun gun manufactured and sold by Axon (formerly known as Taser International).

22. A Taser is an electronic control device ("ECD") that uses replaceable cartridges containing inert, compressed nitrogen to fire two small probes that are attached to insulated conductive wires. In the models generally marketed to non-law enforcement persons, the conductive wires are 15 feet (4.5 meter) in length.

23. Taser models generally marketed to law enforcement agencies use conductive wires with lengths up to 25 feet in length.

24. The probes are designed to penetrate the clothing of an attacker and imbed in the attacker's skin. Electrical energy is sent over the wires into the probes. The charge is transmitted between the two probes and is designed to disrupt the sensory and motor functions to inhibit muscular control of an attacker.

25. With a Taser exposure, the attacker is momentarily incapacitated to allow the person attacked to escape and call for law enforcement assistance, or in the case of a law enforcement officer, to allow for the apprehension of the suspect without further risk of injury to the officer or the suspect.

26. The Taser's electronic charge lasts from five to thirty seconds depending on whether the civilian or the law enforcement model is employed.

27. The most commonly employed civilian Taser is a one-shot device with a 30 second charge. Once fired the device can still be used as a direct contact stun device in the event of a missed shot or in the event of multiple assailants.

28. Axon also manufactures Taser devices having the capacity for multiple shots. These multiple shot devices are commonly used by law enforcement personnel in the performance of their duties.

29. Tasers have several advantages over other non-lethal means of self-defence, such as self-defence sprays or contact weapons.

30. First, self-defence sprays must be administered generally within several feet of an assailant while a civilian model Taser can be deployed within 15 feet. The closer distance the assailant must be to a potential victim for the victim to employ a self-defence spray increases the danger to the potential victim. For example, it is generally recognized by law enforcement that an assailant wielding a contact weapon such as a knife or a club can be a lethal threat at distances of 21 feet or closer. *See* Dennis Tueller, *How Close is Too Close*, Police Policies Study Council, available at http://www.theppsc.org/Staff_Views/Tueller/How.Close.htm (originally published in the March 1983 Edition of SWAT Magazine).

31. Second, pepper sprays can often be ineffectual against highly intoxicated or highly agitated assailants. *See generally* Steven M. Edwards, et al., *Evaluation of Pepper Spray*, National Institute of Justice, U.S. Dept. of Justice, Office of Justice Programs, Research in Brief (February 1997), available at https://www.ncjrs.gov/txtfiles/162358.txt. Tasers, on the other hand, when effectively employed will likely stop an attack from an intoxicated or mentally disturbed attacker.

32. Third, for optimum effect, self-defence sprays should be deployed at the face of the attacker, which is a small target. The Taser is most effective when deployed at other larger parts of the body of the attacker.

33. Fourth, self-defence sprays can end up being blown back at the victim if used in a windy environment, resulting in incapacitating the victim rather than the attacker. This is not an issue with an electric arm.

34. Likewise, Tasers have advantages over the variety of contact weapons as well such as police type batons or knives. Allowing an attacker too close to contact distance creates a high degree of danger to a potential victim.

35. Contact weapons can also be more difficult for persons of lesser strength to deploy, compared to a Taser.

36. Moreover, use of any contact weapon, such as a knife or club, carries a high degree of risk of death or serious bodily harm to the assailant, whereas risk of death or serious bodily harm from a Taser or stun gun is minimal.

37. On a related note, given that use of a knife or club could qualify as the use of deadly force, an individual using a knife or club to defend against a criminal attack, has a high legal standard to meet to sustain a claim self-defence.

38. Tasers have been widely used by law enforcement agencies throughout the United States and the world. More than 18,000 law enforcement agencies use the devices.

39. Studies have shown Tasers to reduce injuries to both law enforcement officers and to suspects. The United States Department of Justice found that Tasers result in fewer injuries to suspects and officers than all other means of subduing suspects.

40. In the event of deployment of a civilian Taser, the device releases some 24 small confetti like tags called AFIDs which are packed into the firing mechanism. When the Taser cartridge is engaged, the AFIDs fly out of the Taser and scatter around the area where the device was utilized.

41. The term AFID stands for Anti Felon Identification. Taser utilizes AFIDs to deter criminal misuse of its product. Taser can trace the purchaser of the device from data contained on an AFID.

42. Tasers and other electronic weapons are in common use for self-defence. The Michigan Court of Appeals found that "Hundreds of thousands of Tasers and stun guns have been sold to private citizens," *People v. Yanna*, 297 Mich. App. 137, 144, 824 N.W. 2d 241, 245 (2012). Concurring in the *per curiam* reversal of the Massachusetts Supreme Judicial Court's upholding of a ban on stun guns, Justice Alito stated, "While less popular than handguns, stun guns are widely owned and accepted as a legitimate means of self-defence across the country." *Caetano v. Massachusetts*, 136 S. Ct. 1027 (March 21, 2016) (Alito, J., concurring).

43. Other forms of stun guns that do not deploy probes are also used for self-defense.

44. These stun guns range from contact weapons which require the user to come in close vicinity to ranged weapons like the Taser.

45. Depending on the situation there are benefits to deploying a Taser in drive stun mode or a deploying a stun gun over deploying the Taser probes.

46. The most notable one is if a person is surprised and attacked at extreme close range, i.e. in a grappling situation, a contact stun gun or a Taser in drive stun mode may be more effective than deploying the Taser probes because it is easier to deploy at this distance.

47. At this range, contact stun guns also have an advantage over other arms.

48. A baton requires space to swing which may be unavailable at close range.

49. A knife will only subdue an attacker if it scores a hit on a vital spot whereas the electric shock of a stun gun can subdue an attacker with a strike on any part of the body. Additionally, usage of knives can cause severe bodily injury and even death.

50. A stun gun does not require strength to use where as both knives and batons require a significant amount of upper body strength to use effectively

51. At extremely close range, defensive sprays are hard to deploy and can impact both the attacker and the person deploying the spray.

52. There are more than 5 million stun guns legally in use by civilians in the United States.

53. Electric arms are designed for use during self-defense against a human attacker.

54. Electric arms' primary function and purpose is to be used as a nonlethal form of self-defense against a human attacker.

55. Only two states currently ban electric arms: Hawaii and Rhode Island.

### c. State of Rhode Island Law.

56. R.I. Gen. Laws § 11-47-42(a)(1) provides that: "[n]o person shall carry or possess or attempt to use against another any instrument or weapon of the kind commonly known as a blackjack, slingshot, billy, sandclub, sandbag, metal knuckles, slap glove, bludgeon, stun-gun, or the so called "Kung-Fu" weapons."

57. This provision provides that "[a]ny person violating the provisions of these subsections shall be punished by a fine of not more than one thousand dollars ($1,000) or by imprisonment for not more than one year, or both, and the weapon so found shall be confiscated." *Id.*

58. This prohibition also applies to Tasers as a form of electric arms because a Taser can be used as a stun gun without deploying its probes.

59. Thus, it is unlawful under Rhode Island law to possess in one's home or to be armed with a stun gun or Taser. As such, Rhode Island's law is a complete ban on a class of arms.

### d. Plaintiff Michael P. O'Neil

60. Plaintiff O'Neil desires to purchase an electric arm for self-defense and other lawful purposes in his home, outside his home, whilst traveling between these locations and in all other locations.

61. Plaintiff O'Neil is an aircraft mechanic and the Vice-President of Rhode Island 2nd Amendment Coalition.

62. Plaintiff O'Neil currently wishes to purchase a stun gun or Taser for lawful self-defense and does not solely due to Rhode Island law.

63. Plaintiff O'Neil has never been convicted of a crime that would disqualify him from firearms ownership under either Rhode Island or federal law.

64. Plaintiff O'Neil has never been diagnosed with a mental disorder that would disqualify him from firearms ownership under Rhode Island or federal law.

65. Plaintiff O'Neil does not abuse alcohol or use illegal drugs.

66. Plaintiff is aware of the potential legal, economic and psychological ramifications of even the justified use of deadly force to defend himself or his home against a violent criminal attack.

67. Plaintiff would prefer to minimize the likelihood that he would have to resort to deadly force in the event he was forced to defend himself or his home from a violent criminal attack.

68. Plaintiff would desire to possess a Taser and stun gun to have readily accessible within the home for self-defense and protection of his family.

69. Plaintiff O'Neil desires to purchase a Taser Pulse or a stun gun. However, Plaintiff fears prosecution for possessing and carrying a Taser. *See* Exhibit "1."

70. But for Rhode Island law, O'Neil would acquire, possess, carry and where appropriate use a Taser and/or stun gun to protect himself, his home, and his family.

### e. Plaintiff Nicola Grasso

71. Plaintiff Grasso desires to purchase an electric arm for self-defense and other lawful purposes in his home, business, whilst traveling between these locations and in all other locations.

72. Plaintiff Grasso is the former President of the Rhode Island Federated Sportsman's Association.

73. Plaintiff Grasso currently wishes to purchase a stun gun or Taser for lawful self-defense and does not solely due to Rhode Island law.

74. Plaintiff Grasso has never been convicted of a crime that would disqualify him from firearms ownership under either Rhode Island or federal law.

75. Plaintiff Grasso has never been diagnosed with a mental disorder that would disqualify him from firearms ownership under Rhode Island or federal law.

76. Plaintiff Grasso does not abuse alcohol or use illegal drugs.

77. Plaintiff is aware of the potential legal, economic and psychological ramifications of even the justified use of deadly force to defend himself or his home against a violent criminal attack.

78. Plaintiff would prefer to minimize the likelihood that he would have to resort to deadly force in the event he was forced to defend himself or his home from a violent criminal attack.

79. Plaintiff would desire to possess a Taser and stun gun to have readily accessible within the home for self-defense and protection of his family.

80. Plaintiff Grasso desires to purchase a Taser Pulse or a stun gun. However, Plaintiff fears prosecution for possessing and carrying one. *See* Exhibit "2."

81. But for Rhode Island law, Grasso would acquire, possess, carry and where appropriate use a Taser and/or stun gun to protect himself, his home, and his family.

## COUNT I

## U.S. CONST., AMEND. II

82. The Defendants prohibit Plaintiffs from acquiring, possessing, carrying and using a defensive arm in common use, i.e., an electric arm. As such it violates Plaintiffs' Second Amendment rights.

83. Defendants' laws, customs, practices and policies generally banning the acquisition, possession, carrying and use of Tasers and other electronic arms violates the Second Amendment to the United States Constitution, facially and as applied against the Plaintiffs in this action, damaging Plaintiffs in violation of 42 U.S.C. § 1983. Plaintiffs are therefore entitled to preliminary and permanent injunctive relief against such laws, customs, policies, and practices.

## COUNT II

## (DECLARATORY JUDGMENT)

84. Plaintiffs repeat and reallege the allegations of the preceding paragraphs as if set forth herein.

85. The Declaratory Judgment Act provides: "In a case of actual controversy within its jurisdiction, any court of the United States may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. 2201(a).

86. Absent a declaratory judgment, there is a substantial likelihood that Plaintiffs will suffer irreparable injury in the future.

87. There is an actual controversy between the parties of sufficient immediacy and reality to warrant issuance of a declaratory judgment.

88. This Court possesses an independent basis for jurisdiction over the parties to declare the parties' rights with respect to the Second Amendment.

89. A judgment declaring that the State of Rhode Island's ban on the ownership and carry of electric arms violates the Second Amendment will serve a useful purpose in clarifying and settling the legal relations at issue and will terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the proceeding.

90. Defendants' laws, customs, practices and policies generally banning the acquisition, possession, carrying and use of Tasers and other electronic arms violates the Second Amendment to the United States Constitution, facially and as applied against the Plaintiffs in this action, damaging Plaintiffs in violation of 42 U.S.C. § 1983. Plaintiffs are therefore entitled to a declaration declaring such laws, customs, policies, and practices unconstitutional.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs request that judgment be entered in their favor and against Defendants as follows:

1. An order preliminarily and permanently enjoining Defendants, their officers, agents, servants, employees, and all persons in active concert or participation with them who receive actual notice of the injunction, from enforcing R.I. Gen. Laws §11-47-42 ban on the acquisition, possession, carrying or use of Tasers and other electronic arms as-applied to Plaintiffs and additionally against other similarly situated law abiding persons;

2. An order declaring that R.I. Gen. Laws §11-47-42 with regard to the ban on electric arms, is unconstitutional and violates the Second Amendment to the United States Constitution as-applied to Plaintiffs and facially;

3. An order declaring R.I. Gen. Laws §11-47-42 unenforceable as-applied to Plaintiffs and facially;

4. Costs of suit, including attorney fees and costs pursuant to 42 U.S.C. §1988;

5. Such other Declaratory relief consistent with the injunction as appropriate; and

6. Such other further relief as the Court deems just and appropriate.

Dated: November 20, 2019.

                    Respectfully submitted,
                    **MICHAEL P. O'NEIL AND NICOLA GRASSO**
                    By and through their legal counsel,

                    Frank R. Saccoccio Esq. #5949
                    Comerford & Saccoccio
                    928 Atwood Avenue
                    Johnston, Rhode Island 02919
                    (401) 944-1600 * 942-8921 Fax
                    Frank.CSLawOffice@gmail.com

                    Co-Counsel / Cooperating Attorney for Plaintiff
                    Alan Alexander Beck
                    Law Office of Alan Beck
                    2692 Harcourt Drive
                    San Diego, CA 92123
                    (619) 905-9105
                    Hawaii Bar No. 9145
                    Alan.alexander.beck@gmail.com
                    *(Pro Hac Vice Paperwork Forthcoming)*

                                          _____
                                          Co-Counsel / Cooperating Attorney for Plaintiff
                                          Stephen D. Stamboulieh
                                          Stamboulieh Law, PLLC
                                          P.O. Box 4008
                                          Madison, MS  39130
                                          (601) 852-3440
                                          stephen@sdslaw.us
                                          Mississippi Bar No. 102784
                                          *(Pro Hac Vice Paperwork Forthcoming)*