## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| MICHAEL P. O'NEIL and NICOLA GRASSO, | : | |
| *Plaintiffs,* | : | |
| v. | : | C.A. No. 1:19-cv-612-WES-PAS |
| PETER F. NERONHA, in his Official Capacity as Attorney General of Rhode Island and COLONEL JAMES M. MANNI, in his Official Capacity as The Superintendent of the Rhode Island State Police, | : | |
| *Defendants.* | : | |

## DEFENDANTS' RESPONSES TO PLAINTIFFS' FIRST SET OF INTERROGATORIES

Peter F. Neronha, in his official capacity as Attorney General of Rhode Island, and James M. Manni, in his official capacity as the superintendent of the Rhode Island State Police, (together, "Defendants") provide the following responses to Plaintiffs' First Set of Interrogatories.

### General Objections and Stipulations

1. Each answer is made subject to all objections as to competence, relevance, materiality, propriety, and admissibility, as well as any and all other objections and grounds which would require the exclusion of evidence at trial. Defendants reserve the right to make any and all such objections at trial and in any proceeding related to this action.

2. Defendants object generally to any interrogatory that is vague, overbroad, unduly burdensome, irrelevant, or not reasonably calculated to lead to the discovery of admissible evidence on the limited issues raised at trial, and further object to any aspect of the interrogatories that are not limited in time or scope or that operate to broaden the scope of the pleadings, either directly or by implication.

3. Defendants object to any discovery request that seeks material subject to any privilege or protection, including without limitation the attorney-client privilege, the attorney-work-product doctrine, or other applicable privilege, including but not limited to communications between and documents exchanged by Defendants and counsel, information learned or

Exhibit "A"

developed by counsel or expert consultants through investigation in connection with this litigation, or information or documents reflecting the impressions, conclusions, opinions, and legal research or other theories of Defendants' counsel in preparation for litigation.

4. Defendants objects to any request which seeks information that would violate the privacy rights of individuals who are not parties to this action and disclosure of which is not required under R.I. Gen. Laws § 38-2-1 *et seq.*

5. These objections are stated in this general form in the interests of clarity and brevity of the individual answers that follow, but are specifically incorporated into each answer below, as if the entire text had been set forth at length at each individual location.

6. Where Defendants decide to provide information despite an objection, they do so without prejudice or waiver, in order to avoid unnecessary controversy on points where the Defendants, in their sole discretion, deem that such controversy is not in its interest. Any such disclosure does not constitute any affirmative use of the information in question for the Defendants' purpose in the litigation.

7. Defendants expressly reserve the right to supplement these answers as additional information becomes known through the discovery process.

8. The following answers to specific interrogatories are made subject to and without waiving these general objections or any applicable objections asserted by the Defendants in previous pleadings.

### Specific Objections and Responses to Interrogatories

**INTERROGATORY NO. 1:** Identify all documents you plan to introduce as evidence at the trial of this matter.

**Response: Such documents, if any, have not yet been identified and are subject to the attorney-work-product doctrine. Defendants expressly reserve the right to supplement this answer if and when they identify these documents.**

**INTERROGATORY NO. 2:** Identify all persons or entities whom you or your representatives know or believe have knowledge of any discoverable matter.

**Response: Objection—this interrogatory is unduly burdensome, vague, and unlikely to lead to discovery of admissible evidence. Notwithstanding these objections and without waiving same, Rhode Island State Police Lieutenant Mark Gilson.**

**INTERROGATORY NO. 3:** Identify all individuals with whom you have spoken or communicated orally or in writing, about the subject matter of this lawsuit, or about the conduct, actions, behavior, or statements of Plaintiffs and for each individual identified, describe the person(s) with whom you were speaking, the substance of the communication, the place, time and

date of the communication, any witnesses to the communication, and identify by giving a
description and location of any documents that may relate in any way to the communications.

**Response: Objection—this interrogatory seeks information that is irrelevant, that
is unlikely to lead to the discovery of admissible evidence, and that is subject to privilege,
including the attorney-client privilege and the attorney-work-product doctrine.
Notwithstanding these objections and without waiving same, Rhode Island State Police
Lieutenant Mark Gilson.**

**INTERROGATORY NO. 4:** Identify all past and present lawsuits against the State of
Rhode Island and any criminal actions brought against any individual or individuals by the Rhode
Island State Police, Rhode Island City or Town Police Department or the State of Rhode Island,
its municipalities, counties and/or any other agency of the state relating to the possession and/or
use of stun guns and/or Tasers and in this include the docket numbers, a brief description of the
case, a list of all charges in each case, the disposition of said case(s) and whether the case(s) is
(are) public record and if any such cases have been sealed or expunged. If the records are public,
please direct Plaintiffs where to locate those records.

**Response: Objection—this interrogatory seeks information that is irrelevant, that
is unlikely to lead to the discovery of admissible evidence, and that is unduly burdensome
and overbroad. Notwithstanding these objections and without waiving same, Defendants
are not aware of any past or present lawsuits against the State of Rhode Island related
to the possession and/or use of stun guns and/or TASERs (i.e., Thomas A. Swift Electric
Rifles).**

**Rhode Island State Police arrest reports from the past approximately twenty
years related to the possession and/or use of stun guns and/or TASERs are included in
Defendants' Responses to Plaintiffs' First Set of Requests for Production. The ultimate
disposition of these arrests is publicly available at https://publicportal.courts.ri.gov/.**

**INTERROGATORY NO. 5:** For each person you expect to call as an expert witness at
trial, including generally employed expert(s) whose information was not acquired in preparation
for this particular trial, state the following:

    (1) The name, address and qualifications of each expert;
    (2) The subject matter on which the expert is expected to testify;
    (3) The substance of the facts and opinions to which the expert is expected to testify;
    (4) A summary of the grounds for each such opinion; and
    (5) The expert's resume or Curriculum Vitae.

**Response: Lieutenant Mark Gilson, whose business address is 311 Danielson Pike, North
Scituate, RI 02857. Lieutenant Gilson has serviced with the Rhode Island State Police for 23
years. He has been a firearms instructor for the Rhode Island State Police for 21 years and
principal TASER instructor for the last 12 years. Lieutenant Gilson has been the principal
firearms instructor and armorer for the Rhode Island State Police and the Rhode Island
Department of Public Safety for the past 7 years. Lieutenant Gilson is a 1988 graduate of the**

US Air Force Academy, and served in the active and reserve service of the Air Force, Marine Corps, and Army for 29 years. Lieutenant Gilson was an attack helicopter pilot in the US Marine Corps, participating in combat tours in Somalia and Iraq. Lieutenant Gilson retired from the US Military in 2013.

Lieutenant Gilson may offer opinion testimony regarding the differences between stun guns and TASERs based upon his background, training, and experience. Stun guns are hand-held battery-powered devices which produce an arc (spark) from one electrode to another to produce pain when contact is made with a person's flesh. TASERs are multi-function conducted-energy weapons, which in their primary mode of employment propel two steel projectiles connected to wires up to a distance of 25 feet. When its projectiles that act as probes pierce the skin, a TASER can send electrical current through the wires and probes into a person's body to induce strong, incapacitating muscle contractions. Although a TASER also has a secondary "Drive Stun" mode, similar in function to a stun gun, because it can propel projectiles it is a much more complex weapon than a stun gun.

**INTERROGATORY NO. 6:** Describe in detail and with specificity how those authorized to carry Tasers or other electronic arms are trained and certified and whether they are exposed to an electrical shock with the weapon as part of the training regimen, if any.

Response: Objection—this interrogatory seeks information that is irrelevant to the statute at issue in this case, R.I. Gen. Laws § 11-47-42, which refers to "stun-gun[s]," not TASERs. It is also unlikely to lead to the discovery of admissible evidence. Notwithstanding these objections and without waiving same, the training and certification regimen for TASERs consists of an initial training and annual recertification training, as follows:

Initial Training

Rhode Island State Police TASER operators are required to complete a (minimum) 6-hour user course. During the most recent Rhode Island State Police Academy, 8 hours were utilized due to large class size.  This course consists of the following:

1.  Classroom presentation (PowerPoint from Axon) with a hands-on component using actual TASER units to learn nomenclature and functions.  Two written tests are completed: one general TASER test and one specific to the TASER model we employ (currently the X-26P).

2.  Dry-firing drills to build muscle memory and familiarity with TASER functions. The drills involve drawing, activating, firing, and reloading the TASER, as well as dealing with malfunctions.

3.  Live-firing the TASER at a human-sized target which has "approved target zones" clearly marked.

4. Scenarios during which troopers are put under stress and forced to make rapid decisions while engaging threats.

5. During their initial training, troopers will fire one live training cartridge (monofilament line with .25-inch probes) and four live duty cartridges (wire and .5-inch probes).

Exposure to electrical energy is completely voluntary. During our last three Academy classes (2013, 2016, 2019), all recruits volunteered for exposure. Exposure consists of a 5-second TASER activation with wires attached via alligator clips to the trainee's back—one at shoulder level and one at the belt line.

Recertification Training

Rhode Island State Police TASER operators are required to complete a 2-hour recertification annually. This consists of the following:

1. Completion of the TASER Annual User Update PowerPoint presentation (online).

2. Review of Rhode Island State Police General Order 57I – Conducted Energy Weapons (online).

3. Classroom components: Review the current version of the TASER Law Enforcement Product Warning and the CEW Study Aid: Smart User Considerations. Pass a functional test. Conduct dry drills that involve drawing, engaging, reloading, and handling TASER malfunctions, as well as deploying a minimum of 2 live cartridges at approved target areas.

INTERROGATORY NO. 7: Describe in detail and with specificity the training and certification requirements for those authorized to carry handguns in the line of duty and how it differs from training on Tasers and/or other electronic arms.

Response: Objection—this interrogatory seeks information that is irrelevant and that is unlikely to lead to the discovery of admissible evidence. It is also vague as it regards the term "electronic arms." Notwithstanding these objections and without waiving same, the Rhode Island State Police's handgun training and certification regimen consists of an initial training and biannual recertification training, as follows:

Initial Training

Rhode Island State Police recruits go through an 80-hour initial firearms training program for the pistol. This training includes the following:

1. Classroom instruction teaching nomenclature, function, disassembly and cleaning.

5

2. Dry-fire drills that involve loading, firing, picture/sight alignment, reloading, malfunctions, and disabled-hand shooting.

3. Live-fire drills that involve same activities as dry-fire drills but with live ammunition.

4. Participation in a scenario-based stress course.

5. Participation in a firearms simulator and shoot/don't-shoot training.

Recertification Training

Rhode Island State Police sworn personnel undergo firearms qualifications and training drills twice a year: once in the spring, and once in the fall. Sworn members must pass a live-fire qualification course in both trainings.

1. Spring training: Typically 6 hours in duration and involving live-fire drills and qualification courses.

2. Fall training: Typically 6 hours in duration and involving live-fire drills, qualification courses, and low-light firing.

The differences between handgun and TASER training can be gleaned from a comparison of the above response with that to Interrogatory No. 6.

**INTERROGATORY NO. 8:** Do you consider Tasers and/or stun guns lethal, non-lethal or less-than-lethal? Please provide your answer/conclusion(s) and explain with specificity the basis and evidence relied upon for your conclusions.

Response: Objection—this interrogatory seeks information that is irrelevant and that is unlikely to lead to the discovery of admissible evidence. It is also vague as it regards the terms "lethal," "non-lethal," and "less-than-lethal." Notwithstanding these objections and without waiving same, TASERs are carried by Rhode Island State Police sworn personnel. The Rhode Island State Police classifies the TASER as a Less Lethal weapon that is used to incapacitate a threat in order to take them into custody. The electrical energy from a TASER is high in voltage but very low in amperage. The electrical energy itself will not damage or destroy tissue, but it causes strong incapacitating muscle contractions.

The Rhode Island State Police General Orders provide:

RISP General Order 57I – Conducted Electrical Weapons

TASER – a handheld, energy conducting weapon that fires probes into a subject from a compressed air cartridge. These probes are connected to the TASER by insulated

wires and are used to send out high voltage electrical pulses of short duration. The electrical pulses affect the sensory and motor functions of the central nervous system, interrupting voluntary control of the skeletal muscles and causing immediate, involuntary muscle contractions. The TASER can be utilized with an air cartridge (with the intended effect of neuromuscular incapacitation) or without a cartridge in drive stun mode.

From RISP General Order 57A – Use of Force

Definitions:

LESS LETHAL FORCE: Any use of force other than that which is considered lethal or deadly force.

LETHAL FORCE: Any use of force that is likely to cause death or serious bodily injury. Lethal Force is also referred to as deadly physical force.

SERIOUS BODILY INJURY: Physical injury that (1) creates a substantial risk of death; (2) causes protracted loss or impairment of the function of any bodily part, member or organ; or (3) causes serious permanent disfigurement.

INTERROGATORY NO. 9: Please list all deaths or serious injuries of those trained to use Tasers and/or stun guns from being voluntarily exposed to an electrical shock with the weapons in the State of Rhode Island, including but not limited to law enforcement agents, department of corrections and any other agency or department that are authorized to use Tasers and/or stun guns.

Response: Objection—this interrogatory seeks information that is irrelevant and that is unlikely to lead to the discovery of admissible evidence. It is also vague as it regards the term "serious injuries." Notwithstanding these objections and without waiving same, Defendants are aware of none.

INTERROGATORY NO. 10: Please explain your interest in denying Plaintiffs the use of a stun gun and/or Taser to defend themselves with.

Response: Objection—this interrogatory seeks information that is irrelevant and that is unlikely to lead to the discovery of admissible evidence. It is also vague as it regards the term "interest." Notwithstanding these objections and without waiving same, Defendants have no interest independent of the laws of the State of Rhode Island.

INTERROGATORY NO. 11: Please describe the number a weapon must reach in sales to be considered in common use, and explain with specificity the basis and evidence relied upon for your conclusion.

Response: Objection—this interrogatory is vague as it regards the phrase "in common use." Insofar as it refers to courts use of that phrase in Second Amendment

jurisprudence, it asks for a legal conclusion and is therefore also objectionable on that basis.

**INTERROGATORY NO. 12:** Please describe in detail how Tasers and/or stun guns are dangerous and unusual.

Response: Objection—this interrogatory seeks information that is irrelevant to the statute at issue in this case, R.I. Gen. Laws § 11-47-42, which refers to "stun-gun[s]," not TASERs. It is also vague as it regards the terms "dangerous" and "unusual." Notwithstanding these objections and without waiving same, TASERs are dangerous insofar as they have the capacity to induce very strong muscle contractions in the body in a very short period of time. If the subject is in poor physical condition, these sudden and powerful muscle contractions can cause him/her to experience an adverse reaction, much like someone in poor physical condition would be likely to have an adverse reaction to hard physical exercise.

TASERs, through these muscle contractions, can cause someone to fall and strike their head on a hard surface or fall from an elevated location. Rhode Island State Police personnel are thoroughly trained to evaluate such circumstances prior to deploying a TASER cartridge. The projectiles from a TASER are stainless steel ½-inch sharpened probes (darts) designed to puncture the skin. These projectiles can, among other things, cause serious injury to the eyes. Rhode Island State Police TASER operators are thoroughly trained to avoid sensitive areas of the body like the throat and eyes. They are trained to aim at designated approved target areas as described in Axon Enterprise, Inc.'s training materials.

**INTERROGATORY NO. 13:** Please describe Rhode Island's original interest in banning stun guns and Tasers.

Response: Objection—this interrogatory seeks information that is irrelevant to the statute at issue in this case, R.I. Gen. Laws § 11-47-42, which refers to "stun-gun[s]," not TASERs. It is also unlikely to lead to the discovery of admissible evidence, and vague as it regards the term "interest." Notwithstanding these objections and without waiving same, Defendants have no interest independent of the laws of the State of Rhode Island.

**INTERROGATORY NO. 14:** For any Request for Admission that was denied or denied as stated, please provide detailed reasoning for your answer.

Response: Objection—this interrogatory seeks information that is irrelevant, that is unlikely to lead to the discovery of admissible evidence, and that is subject to privilege, including the attorney-client privilege and the attorney-work-product doctrine. It is also objectionable insofar as it asks for legal conclusions. Notwithstanding these objections and without waiving same, most denied admissions were already accompanied by an explanation of the denial. The reasoning for those denied without explanation is as follows:

Request for Admission 5 was denied because Defendants are without knowledge and experience as to what is or is not common as it relates to TASERs and stun guns. Request for Admission 16 was denied because it sought irrelevant information: Whether TASERs are available under other sections of the General Laws is not pertinent to Plaintiffs' claim that § 11-47-42 is unconstitutional. Request for Admission 18 was denied because TASERs and stun guns are prohibited in various cities and counties within the United States, as well as in other states such as Germany, Sweden, and the United Kingdom.

**INTERROGATORY NO. 15:** Please describe in detail all documents, things, individuals, or other data sources you reviewed while answering the requests for admission and/or the first set of interrogatories.

Response: All such documents, things, individuals, and other data sources have been identified in these responses or produced in response to Defendants' First Set of Requests for Production of Documents, except for Axon Enterprise, Inc.'s training resources available to the public at https://my.axon.com/s/training-axon-academy, which were also reviewed.

**INTERROGATORY NO. 16:** Do you consider Tasers and/or stun guns to be less dangerous than handguns? If not, why not? Explain with specificity the basis and evidence relied upon for your conclusion.

Response: Objection—this interrogatory seeks information that is irrelevant and that is unlikely to lead to the discovery of admissible evidence. It is also vague as it regards the phrase "less dangerous." Notwithstanding these objections and without waiving same, Defendants do consider TASERs and stun guns to be less dangerous than handguns.

**INTERROGATORY NO. 17:** If you contend that a Taser is a "firearm" under Rhode Island law, please explain in detail how an individual can purchase a Taser; is a Taser purchase required and subject to Federal approval pursuant to the submission of a 4473 form; who is authorized under Rhode Island law to sell a Taser, if an individual can carry a Taser with a Permit issued pursuant to RIGL § 11-47-11 and § 11-47-18; what are the certification and/or qualification procedures for a Taser pursuant to RIGL § 11-47-11 and § 11-47-18; and whether you consider a Taser to be a "pistol" or "revolver".

Response: Objection—Plaintiffs' contest the constitutionality of R.I. Gen. Laws § 11-47-42, which refers to "stun-gun[s]," not TASERs. This interrogatory seeks information that is irrelevant and that is unlikely to lead to the discovery of admissible evidence in this case related to stun guns. Whether TASERs are available under other sections of the General Laws is not pertinent to Plaintiffs' claim that § 11-47-42 is unconstitutional.

**INTERROGATORY NO. 18:** If you contend that a Taser is a "pistol" or "revolver", please explain your contention in detail.

Response: Objection—Plaintiffs' contest the constitutionality of R.I. Gen. Laws § 11-47-42, which refers to "stun-gun[s]," not TASERs. This interrogatory seeks information that

is irrelevant and that is unlikely to lead to the discovery of admissible evidence in this case related to stun guns. Whether TASERs are available under other sections of the General Laws is not pertinent to Plaintiffs' claim that § 11-47-42 is unconstitutional.

**INTERROGATORY NO. 19:** Please explain in detail how a Rhode Island citizen can "qualify" to obtain a license to carry a Taser pursuant to R.I. Gen. Laws § 11-47-15.

**Response: Objection—Plaintiffs' contest the constitutionality of R.I. Gen. Laws § 11-47-42, which refers to "stun-gun[s]," not TASERs. This interrogatory seeks information that is irrelevant and that is unlikely to lead to the discovery of admissible evidence in this case related to stun guns. Whether TASERs are available under other sections of the General Laws is not pertinent to Plaintiffs' claim that § 11-47-42 is unconstitutional.**

**INTERROGATORY NO. 20:** If you denied that Tasers and/or stun guns are bearable arms, please provide your conclusion explain with specificity the basis and evidence relied upon for your conclusion.

**Response: Objection—this interrogatory seeks information that is irrelevant. It is also vague as it regards the phrase "bearable arms," making this interrogatory's predicate impossible to either confirm or deny.**

As to the above responses, I, Lieutenant Mark Gilson, am signing as principal firearms instructor and armorer of the Rhode Island State Police and the Rhode Island Department of Public Safety. I do not have personal knowledge of all the answers to which I am responding herein. Rather, I am signing these responses, which have been compiled using information obtained from documents and legal counsel during discovery, in my official capacity:

LT. _____
Lieutenant Mark Gilson

Subscribed and sworn to before me this 8th day of February, 2021.

**Adam J. Sholes**
**Notary Public**
**State of Rhode Island**

Notary Public 764241
My Commission expires: 6/19/23

10