## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| MICHAEL P. O'NEIL and NICOLA GRASSO, : <br><br> *Plaintiffs,* : <br><br> v. : <br><br> PETER F. NERONHA, in his Official Capacity as Attorney General of Rhode Island and COLONEL JAMES M. MANNI, in his Official Capacity as The Superintendent of the Rhode Island State Police, : <br><br> *Defendants.* : | C.A. No. 1:19-cv-612-WES-PAS |

### DEFENDANTS' MEMORANDUM IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT AND OBJECTION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

Defendants Attorney General Peter F. Neronha and Colonel James M. Manni, in their official capacities, move for summary judgment and object to Plaintiffs Michael P. O'Neil and Nicola Grasso's motion for summary judgment and submit this memorandum in support of each.

Plaintiffs have sued to invalidate as unconstitutional a law—duly enacted by Rhode Islanders' elected representatives—that prohibits the possession of stun guns. "In urging [this Court] to strike this legislation, appellants would impair the ability of government to act prophylactically" and contribute to a tendency that seeks "to add indefinitely to the growing list of subjects on which the states of our Union and the citizens of our country no longer have any meaningful say." *Kolbe v. Hogan*, 849 F.3d 114, 150–51 (4th Cir. 2017) (en

banc) (Wilkinson, J., concurring). This lawsuit, in other words, is an attempt by Plaintiffs to short circuit the democratic process. Plaintiffs ask this Court to end a vigorous, ongoing, public-policy debate about what weapons Rhode Islanders want to permit themselves to own for self-defense. Neither the Second Amendment nor the Supreme Court has "ordain[ed] such a trampling of the legislative prerogative to enact firearms regulations to protect all the people." *Kolbe*, 849 F.3d at 146.

Plaintiffs' challenge not only misreads the statute at issue; it also misinterprets the Second Amendment as well as controlling Supreme Court and First Circuit precedent. Properly understood, Rhode Island law regulating the possession of stun guns does not burden conduct protected by the Second Amendment. And even if it did, the law is reasonably related to the compelling governmental interest in public safety and crime prevention, and therefore passes constitutional muster. The result sought by Plaintiffs would "deliver a body blow to democracy as we have known it since the very founding of this nation." *Id.* at 150 (Wilkinson, J., concurring). The challenged Rhode Island statute is best left to operate as passed by the people's representatives.

## I. FACTS

Stun guns are "hand-held, battery-powered devices which produce an arc (spark) from one electrode to another to produce pain when contact is made with a person's flesh." Defs.' Resps. To Pls.' First Set of Interrogs. 4 ("Defs.' Interrogs. Resps.") (attached as Ex. A). A Thomas A. Swift Electric Rifle (*i.e.*, a TASER) is "a much more complex weapon than a stun gun": "TASERs are multi-function conducted-energy weapons, which in their primary mode of employment propel two steel projectiles connected to wires up to a distance

of 25 feet." *Id.* at 3–4 These projectiles are meant to "pierce the skin," enabling the TASER to "send electrical current through the wires and probes into a person's body to induce strong, incapacitating muscle contractions." *Id.* at 4. A TASER's primary function is to produce "neuromuscular incapacitation" via deployment of its steel projectiles. *Id.* at 7. TASERs also have a secondary functionality, called "drive stun" mode, that produces a different effect, and one similar to that of a stun gun. *Id.* at 4, 7.

Stun guns and TASERs are both part of broader class of electric weapons that includes everything from cattle prods to high-energy lasers. *See* Stuart Moran, *The Basics of Electric Weapons and Pulsed-Power Technologies*, Navy Surface Warfare Center 50, 50 (2012), https://apps.dtic.mil/dtic/tr/fulltext/u2/a557759.pdf (attached as Ex. B). Plaintiffs have submitted affidavits from various weapons dealers to approximate the number of electric weapons sold in the United States. Pls.' Mem. in Supp. of Their Mot. for Summ. J. Ex. C (ECF No. 30-4). When added together, these affidavits purport to put the number of stun guns sold at around 6.5 million. *See id.* However, given the Plaintiffs concerted effort, discussed below, to conflate stun guns, TASERs, and other electric arms, this number likely includes TASER sales as well. *See* Pls.' Statement of Undisputed Facts 2 (ECF No. 31) ("There are over 6.4 million *electric arms* owned by civilians for lawful purposes in the United States of America." (emphasis added)). And indeed only one of the affidavits is clear that the sales number it presents—1.9 million—does not include TASERs. *Id.* at 7.

Current data have the number of civilian-owned firearms in the United States at over 400 million. Philip B. Levine & Robin McKnight, *Three million more guns: The Spring 2020 spike in firearm sales*, Brookings Inst., July 13, 2020,

https://www.brookings.edu/blog/up-front/2020/07/13/three-million-more-guns-the-spring-2020-spike-in-firearm-sales/; Christopher Ingraham, *There are more guns than people in the United States, according to a new study of global firearm ownership*, Wash. Post, June 19, 2018, https://www.washingtonpost.com/news/wonk/wp/2018/06/19/there-are-more-guns-than-people-in-the-united-states-according-to-a-new-study-of-global-firearm-ownership/. Americans purchased nearly 40 million firearms last year, with 2021 sales expected to be closer to 50 million. Douglas A. McIntyre, *Guns in America: Nearly 40 million guns were purchased legally in 2020 and another 4.1 million bought in January*, USA Today, Feb. 10, 2021, https://www.usatoday.com/story/money/2021/02/10/this-is-how-many-guns-were-sold-in-all-50-states/43371461/.

Handguns make up a majority of new firearm purchases in the last 20 years, and in 2015 already accounted for 42% of all civilian-owned firearms. Lisa Dunn, *How Many People in the U.S. Own Guns?*, WAMU, Sept. 18, 2020, https://wamu.org/story/20/09/18/how-many-people-in-the-u-s-own-guns/. A little mathematics (.42 x 400 million) puts the number of handguns in the U.S. at approximately 168 million. And while handguns are the nation's most popular self-defense weapon, the record here—including Rhode Island State Police arrest reports going back approximately 20 years—does not contain a single incident of someone using a stun gun in self-defense. *See* Defs.' Interrogs. Resps. 3; Defs.' Resps. to Pls.' First Set of Reqs. for Produc. RI00001–63 ("Defs.' Produc. Resps.") (attached as Ex. C).

## II. ARGUMENT

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A material fact is one that "has [the] potential of changing a case's outcome." *Doe v. Trs. of Bos. Coll.*, 892 F.3d 67, 79 (2018). A dispute about a material fact is genuine when "the evidence about the fact is such that a reasonable jury could resolve the point in favor of the nonmoving party." *Id.* (quotation marks omitted). Genuine disputes, if any, need to be resolved by the trier of fact. *Id.* That there are cross-motions for summary judgment does not change these principles, but it does "require the district court to consider each motion separately, drawing all inferences in favor of each non-moving party in turn." *Green Mountain Realty Corp. v. Leonard*, 750 F.3d 30 (1st Cir. 2014) (quotation marks omitted).

### A. Section 11-47-42(a) prohibits the carriage and possession of stun guns, not TASERs or other electric weapons.

Plaintiffs ask in their complaint for "[a]n order declaring R.I. Gen. Laws. § 11-47-42 with regard to the ban on electric arms[] is unconstitutional." Compl. 15. Section 11-47-42 does not ban "electric arms." Instead, it says is that "[n]o person shall carry or possess or attempt to use against another any instrument or weapon of the kind commonly known as a . . . stun-gun," among other decidedly non-electric weapons, such as slingshots and metal knuckles. R.I. Gen. Laws § 11-47-42(a).

To decide whether "stun-gun" as used in Section 11-47-42(a) means stun gun; or, as Plaintiffs would have it, "stun-gun" means electric arms or Thomas A. Swift Electric Rifle (*i.e.*, TASER), the Court looks to the statutory "language itself, the specific context in which that language is used, and the broader context of the statute as a whole." *Robinson v. Shell*

*Oil Co.*, 519 U.S. 337, 341 (1997); *accord W. Reserve Life Assurance Co. of Ohio v. ADM Assocs., LCC*, 116 A.3d 794, 798 (R.I. 2015) ("The plain meaning approach . . . is not the equivalent of myopic literalism, and it is entirely proper for us to look to the sense and meaning fairly deducible from the context." (quotation marks omitted)). If recourse to these sources reveal that the statute's meaning is plain and unambiguous, "the sole function of the courts is to enforce it according to its terms." *In re Fin. Oversight & Mgmt. Bd. for P.R.*, 919 F.3d 121, 128 (1st Cir. 2019) (quoting *United States v. Ron Pair Enters.*, 489 U.S. 235, 241 (1989)).

When, as here, "a statute does not define a term," courts "begin by analyzing the statutory language, assuming that the ordinary meaning of that language accurately expresses the legislative purpose." *FCC v. AT & T Inc.*, 562 U.S. 397, 403 (2011). The statutory language at issue in this case—"stun-gun"—has a clear referent, namely, a "hand-held, battery-powered devices which produce an arc (spark) from one electrode to another to produce pain when contact is made with a person's flesh." Defs.' Interrogs. Resps. 4. TASERs are something different, *i.e.*, "conducted-energy weapons, which in their primary mode of employment propel two steel projectiles connected to wires up to a distance of 25 feet." *Id. see also* ATF Rul. 80-20 (attached as Ex. D) ("[T]he Taser can be described as a hand-held device designed to expel, by means of an explosive, two electrical contacts (barbs) which are connected by two wires to a high voltage source in the device."). And electric arms is a much broader category to which both stun guns and TASERs belong. *See* Moran, *supra*, at 50.

6

Despite these differences in plain-language denotation, Plaintiffs argue that "stun-gun" must at least mean TASER, because TASERs have a secondary use, the so-call drive stun mode, that resembles stun guns' one and only use. Pls.' Mem. in Supp. of Their Mot. for Summ. J. 2 (ECF No. 30-1) ("Pls.' Mem."). This reading imports an entirely different meaning into the terms of the statute. The implicit principle of statutory construction relied on here by Plaintiffs is that where a statute picks out one object, any other objects that could possibly be used to similar effect are also indicated. Not only does no such principle exist in American law, its adoption would work illogical results: A statute that referred to "fly swatters," for example, would also apply to newspapers (whose secondary function is often insect euthanasia); "flashlight" would come to mean smart phone; "finger," toothbrush; et cetera. Entertaining this improper way to construe a statute would be an affront to good sense, and would in many applications contradict the injunction against construing a statute to reach absurd results. *W. Reserve Life Assurance Co.*, 116 A.3d at 798("[U]nder no circumstances will this Court construe a statute to reach an absurd result." (quotation marks omitted)); *Arvelo v. Ashcroft*, 344 F.3d 1, 8 (1st Cir. 2003) ("It is trite, but true, that courts are bound to interpret statutes whenever possible in ways that avoid absurd results.").

A legally recognized and "venerable canon of statutory construction" going by the phrase "*expressio unius est exclusio alterius*" supports Defendants' plain-language reading of "stun-gun." *United States v. Hernández–Ferrer*, 599 F.3d 63, 67–68 (1st Cir. 2010). This canon, which translates to "the expression of one thing is the exclusion of other things," instructs that Section 11-47-42(a)'s list of prohibited weapons should be read to exclude any weapon not explicitly named. *Id.* The list's length and specificity intimates that the Rhode

7

Island legislature was keen to make fine distinctions among (and name separately) various weaponry, including billies, sandclubs, and blackjacks, as well as others. By its inclusion of "Kung-Fu weapons," the list also demonstrates that the legislature knew how to refer to broad weapon categories. That it did neither of these things—either by naming TASERs separately or by including an umbrella term like "electric weapons"—is further evidence that when the General Assembly said "stun-gun," that is what it meant.

Yet another clue that "stun-gun" does not mean TASER derives from the statutory context: TASERs, unlike stun guns, are "firearms" under Rhode Island's Firearms Act, R.I. Gen Laws Section 11-47-1 *et seq.*, and are therefore treated differently under state law. *See In re Fin. Oversight & Mgmt. Bd.*, 919 F.3d at 131 ("[I]n construing statutory provisions we must be mindful of the broader context of the statute as a whole and avoid creating a conflict between various sections." (quotation marks omitted)). The Firearms Act defines "firearm," in relevant part, as "any machine gun, pistol, rifle, air rifle, air pistol, 'blank gun', 'BB gun', *or other instrument from which steel or metal projectiles are propelled*, or that may readily be converted to expel a projectile." R.I. Gen. Laws § 11-47-2(6) (emphasis added). TASERs, which "propel two steel projectiles connected to wires up to a distance of 25 feet," clearly fit this definition, and are thus regulated as such. *See, e.g.*, § 11-47-3.2(a) ("No person shall use a firearm while committing or attempting to commit a crime of violence.").

Noteworthy too is the fact that the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") has twice ruled that TASERs are firearms under the federal Gun Control Act of 1968. ATF Rul. 76-6 (attached as Ex. E); ATF Rul. 80-20. In the first of these rulings, the ATF "determined that [a TASER] is a weapon and notwithstanding the fact that barbs

8

and wires remain attached to the hand-held device after expulsion, these are projectiles within the meaning of the [Gun Control Act]." ATF Rul. 76-6. The ATF concluded that "[s]ince projectiles are expelled by the action of an explosive, the weapon is a firearm under 18 U.S.C. 921(a)(3)(A)." *Id.* Under both federal and Rhode Island law, then, TASERs are firearms, while stun guns are not. The law already making a distinction between the two suggests that Section 11-47-42(a)'s reference to stun guns does not include TASERs.

Defendants maintain that a plain reading, the relevant canon of construction, and statutory context confirm that the Rhode Island legislature meant what it said: Section 11-47-42(a) prohibits the carriage and possession of stun guns, not TASERs or other electric arms.

**B.  Section 11-47-42(a) does not violate the Second Amendment.**

The Second Amendment provides that "[a] well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. The Supreme Court in *District of Columbia v. Heller* declared that the Second Amendment codified a pre-existing, individual right to keep and bear arms. 554 U.S. 570, 592 (2008) (striking down D.C. handgun regulations). Two years later, in *McDonald v. City of Chicago*, the Supreme Court incorporated the right secured by the Second Amendment, as articulated in *Heller*, against the states. 561 U.S. 742, 750 (2010). Other than confirming the right's existence and applying it to the states, the Court did not provide much detail as to how lower courts were to operationalize the Second Amendment when deciding cases.

To fill this void the First Circuit has adopted the same two-step approach deployed by many of its sister circuits. *See Gould v. Morgan*, 907 F.3d 659, 668 (1st Cir. 2018) (collecting cases). The approach's first step is to "ask whether the challenged law burdens conduct that is protected by the Second Amendment." *Worman v. Healey*, 922 F.3d 26, 33 (1st Cir. 2019). This question is "backward-looking" and "seeks to determine whether the regulated conduct was understood to be within the scope of the right at the time of ratification." *Id.* (quotation marks omitted). If the conduct at issue is not protected by the Second Amendment, the challenged law stands. *Gould*, 907 F.3d at 669. Only if the conduct is found to be protected by the Second Amendment does a court move on to the second step, which is to "determine what level of scrutiny is appropriate" and "whether the challenged law survives that level of scrutiny."[1] *Worman*, 922 F.3d at 33 (quotation marks omitted).

1. <u>Stun guns are not protected by the Second Amendment.</u>

Where, as here, the focus of a Second Amendment challenge is a law regulating the type of weapon—as opposed to one regulating the type of person asserting the right or the location it is being asserted—the question at step one is "whether the proscribed weapon[] [is] in common use for lawful purposes like self-defense." *Id.* at 34 ("[T]he *Heller* Court determined that the Second Amendment 'extends only to certain types of weapons.'"

---

[1] Plaintiffs devote considerable space in their brief to arguing under a framework they call "the categorical approach." Pls.' Mem. 9–11 (ECF No. 30-1). The First Circuit, along with other circuit courts to consider the issue, has clearly insisted on the two-step framework described and applied by Defendants here. *Gould*, 907 F.3d at 668; *see, e.g.*, *N.Y. Rifle & Pistol Assoc. v. Cuomo*, 804 F.3d 242, 254 & n.49 (2d Cir. 2015) (collecting cases). And in fact the *Worman* court explicitly spurned Plaintiffs' mode of analysis. *Worman*, 922 F.3d at 38 n.6 ("We reject the plaintiffs' premise that the Act is a categorical ban and disagree with the Illinois Supreme Court's conclusion that any law that restricts a certain type of arms is per se unconstitutional." (citation omitted)).

(quoting *Heller*, 554 U.S. at 623)); *accord N.Y. Rifle & Pistol Assoc. v. Cuomo*, 804 F.3d 242, 253 (2d Cir. 2015) ("[T]he Second Amendment protects only those weapons in common use by citizens for lawful purposes like self-defense." (quotation marks omitted)); *see also Heller*, 554 U.S. at 626 (explaining that the right secured by the Second Amendment is "not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose."); *Kolbe*, 849 F.3d at 135 (holding that assault weapons "are among those arms that the Second Amendment does not shield"). If the answer to this question is no, as it is in this case, the inquiry ends and the challenged law is valid. *Gould*, 907 F.3d at 669.

*Heller* employed as the benchmark for this common-use analysis the number of handguns used in the United States for self-defense. *Heller*, 554 U.S. at 628–29 (referring to handguns as "the quintessential self-defense weapon"; "an entire class of arms that is overwhelmingly chosen by American society for [the] lawful purpose [of self-defense]"; and "the most popular weapon chosen by Americans for self-defense in the home."); *Worman*, 922 F.3d at 36 (explaining that in fashioning its rationale in *Heller*, "the Court repeatedly emphasized the unique popularity of the handgun as a means of self-defense"); *see also Kolbe*, 849 F.3d at 132, 145 (noting "the relevance of the handgun's status as 'the quintessential self-defense weapon'—a status that was obviously and unquestionably important to the *Heller* Court" (quoting *Heller*, 554 U.S. at 628–29)). In other words, according to the Supreme Court, handguns are sufficiently common and commonly used for self-defense to garner Second Amendment protection. *See Worman*, 922 F.3d at 35 ("*Heller* made plain that handguns, which the Court described as 'the most popular weapon chosen by Americans for self-defense in the home,' are protected." (quoting *Heller*, 554 U.S. at

629)); *United States v. One (1) Palmetto State Armory PA–15 Machinegun Receiver/Frame, Unknown Caliber Serial No.: LW001804*, 822 F.3d 136, 144 (3d Cir. 2016) ("*Heller* gives special consideration to the District of Columbia's categorical ban on handguns because they 'are the most popular weapon chosen by Americans for self-defense in the home.' This does not mean that a categorical ban on any particular type of bearable arm is unconstitutional." (quoting *Heller*, 554 U.S. at 629)).

And the *Heller* Court set the common-use bar at the prevalence of handguns by relying on the D.C. Circuit's opinion below, *Parker v. District of Columbia*, 478 F.3d 370, 400 (D.C. Cir. 2007), which itself relied on a 1995 study published in the Journal of Law and Criminology, *id.* (citing Gary Kleck & Marc Gertz, *Armed Resistance to Crime: The Prevalence and Nature of Self–Defense with a Gun*, 86 J. Crim. L. & Criminology 150, 182–83 (1995)). Using survey data, this study estimated the number of defensive uses of handguns in the United states from 1988 through 1993. Kleck & Gertz, *supra* at 182–83.

Plaintiffs must likewise prove their case. And on that score Plaintiffs have provided no comparable data regarding stun guns. The most they have done is provide sales data, in the form of affidavits, that estimate the number of stun guns sold nationwide around 6.5 million. *See* Pls.' Mem. Ex. C. It is far from clear, though, that all 6.5 million are in fact stun guns. *See* Pls.' Statement of Undisputed Facts 2 ("There are over 6.4 million *electric arms* owned by civilians for lawful purposes in the United States of America." (emphasis added)). As discussed above, Plaintiffs are under the impression that TASERs and electric arms are stun guns, making it likely they included a request for all electric arms sales in their

12

solicitation of these data. One affiant does, however, make clear that its recorded stun-gun sales, all 1.9 million of them, do not include TASERs. *Id.* at 7.

Assuming *arguendo* that Americans own a total of 6.5 million stun guns (or even rounds that number up to 7 or 10 million), this is would not amount to "*common* use" under any sense of the word. "Common" means "occurring or appearing frequently," "widespread." *Common*, Merriam–Webster Dictionary, https://www.merriam-webster.com/dictionary/common; *cf. Kolbe*, 849 F.3d at 136 (using a dictionary to ascertain the meaning of "like" as used in *Heller*). Televisions are in common use, sneakers are in common use, cell phones are in common use. In a country of over 330 million people, stun guns are not: Assuming all 6.5 million stun guns were sold to separate people,[2] only 1 percent of Americans own a stun gun. *See Kolbe*, 849 F.3d at 141 (upholding ban on assault weapons that "were owned by less than 1% of Americans as recently as 2013").10 million stun guns would increase this to a mere 3 percent. This does not present a material issue of fact in dispute.

Furthermore, again assuming the 6.5 million number, the ratio of handguns in the United States (approximately 168 million) to stun guns is over 25 to 1. With 10 million stun guns, the ratio is closer to 17 to 1. And even at 10 million, the number of stun guns is dwarfed by the over 400 million firearms of all types owned in the U.S. *See* Levine & McKnight,

---

[2] This is an assumption that may overstated, since weapon ownership tends to concentrate in the U.S., with fewer and fewer people owning an ever-greater share of them. *See Kolbe v. O'Malley*, 42 F. Supp. 3d 768, 786 (D. Md. 2014), *aff'd on other grounds*, 849 F.3d 114, 121 (4th Cir. 2017) ("In recent decades, gun ownership in the United States has become increasingly concentrated; fewer households own firearms, but those households owning guns own more of them.").

*supra*; *cf. Kolbe*, 849 F.3d at 126 (noting estimate of at least 8 million assault weapons owned in the U.S. "comprised less than 3% of the more than 300 million firearms in this country"). All this to say that stun guns are not in common use, however defined, and therefore, pursuant to *Worman*'s applicable step-one test, unprotected by the Second Amendment. *See Teter v. Connors*, 460 F. Supp. 3d 989 (D. Haw. 2020) (upholding against Second Amendment attack Hawai'i's ban on butterfly knives, in part because "[t]he butterfly knife is not nearly as popularly owned and used for self-defense as the handgun." (quotation marks omitted)).

Even if stun guns were commonly owned, Plaintiffs produce nothing akin to *Heller*'s Journal of Law and Criminology study showing to what use stun guns are put. The only record evidence probative of this point is the Rhode Island State Police's arrest reports that mention stun guns. *See* Defs.' Interrogs. Resps. 3; Defs.' Produc. Resps. RI00001–63; Not once in this historical record going back approximately 20 years is there an incident where a stun was used in self-defense. *See* Defs.' Interrogs. Resps. 3; Defs.' Produc. Resps. RI00001–63; *cf. Kolbe*, 849 F.3d at 127 (finding relevant that "[n]either the plaintiffs nor Maryland law enforcement officials could identify a single incident in which a Marylander has used a military-style rifle or shotgun, or needed to fire more than ten rounds, to protect herself."); *Kolbe v. O'Malley*, 42 F. Supp. 3d 768, 788–89 (D. Md. 2014), *aff'd on other grounds*, 849 F.3d 114, 121 (4th Cir. 2017) ("As for their claims that assault weapons are well-suited for self-defense, the plaintiffs proffer no evidence beyond their desire to possess assault weapons for self-defense in the home that they are in fact commonly used, or possessed, for that purpose."). So even if stun guns were in common use, which they most

14

certainly are not, the factual record in this case creates a reasonable inference, and an unrebutted one, that they are that not commonly used "for lawful purposes like self-defense." No genuine issue of material fact exists on this point. *Worman*, 922 F.3d at 35. Stun guns are therefore unprotected by the Second Amendment. *Cf. Kolbe*, 42 F. Supp. 3d at 788 ("[T]he court seriously doubts that the banned assault long guns are commonly possessed for lawful purposes, particularly self-defense in the home, which is at the core of the Second Amendment right . . . .").

*Caetano v. Massachusetts* is not to the contrary. 577 U.S. 411, 412 (2016) (per curiam) (vacating the Massachusetts Supreme Judicial Court's determination that stun guns are not protected by the Second Amendment because "the explanation the Massachusetts court offered for upholding the law contradicts this Court's precedent"). All *Caetano* did was disclaim the *reasoning* the Supreme Judicial Court used to reach its conclusion that stun guns are not protected.[3] *Caetano*, 577 U.S. at 412. The Supreme Court picked out three reasons in particular for denunciation: that stuns guns are not constitutionally protected because they (1) "were not in common use at the time of the Second Amendment's enactment"; (2) are "a thoroughly modern invention"; and (3) are not "readily adaptable to use in the military." *Id.* at 411–12 (quoting *Commonwealth v. Caetano*, 26 N.E.3d 688, 693–94 (Mass. 2015).

*Caetano* has no impact on a straightforward application of the inquiry the First Circuit sets out in type-of-weapons cases at this the first step of the proper Second

---

[3] Plaintiffs repeatedly cite *Caetano*'s two-justice concurrence as the governing law, Pls.' Mem. 3–6, which of course it is not.

Amendment analysis. *Worman*, 922 F.3d at 35 ("[T]he question is whether the proscribed weapons are in common use for lawful purposes like self-defense."); *see* René Reyes, *Second Thoughts about Stun Guns*, 74 Wash. & Lee L. Rev. Online 450, 452 (2018) (noting that an inquiry that focuses on the relative rarity of stun guns today is "fully consistent with both the scope and limitations of the right to bear arms under the Supreme Court's recent Second Amendment jurisprudence"). And far from foreclosing this inquiry, the *Caetano* Court intentionally left it open: Rather than holding that stun guns are constitutionally protected— which it doubtless could have done, but for which, judging from the (un)popularity of the concurring opinion, there were only two votes—the Court simply vacated the lower court's decision and remanded for further proceedings. *See Id.* at 456–57 ("The fact that a majority of the Court declined to adopt Justice Alito's reasoning strongly suggests that an argument rooted in the modern scarcity of such weapons remains constitutionally viable even after *Caetano* . . . .").

Aside from the Court's narrow ruling in *Caetano*, further indication that stun guns do not fall under the aegis of the Second Amendment speaks to the "backward-looking," historical nature of the first-step inquiry. *Worman*, 922 F.3d at 33; *Heller*, 554 U.S. at 599 (noting that the Second Amendment was not intended to lay down a "novel principle but rather codified a right inherited from our English ancestors" (brackets and quotation marks omitted)). That is, the Court in *Heller* made clear that certain "longstanding prohibitions" are "presumptively lawful." 554 U.S. at 626–27 & n.26. It is noteworthy, then, that the Rhode Island General Assembly saw fit to insert "stun[-]gun" into a list it started in 1896

16

and that includes such historical weapons as a "blackjack, slingshot . . . sandclub, sandbag, metal knuckles, [and] slap glove." R.I. Gen. Laws § 11-47-42(a).

Such placement is of constitutional significance: Writing recently for the en banc Ninth Circuit, Judge Bybee conducted an exhaustive review of early English and American weapon regulation to find that history shot through with bans of "small, hand-held weapons, capable of being concealed, including pistols, revolvers, dirks, daggers, brass knuckles, and slung shots." *Young v. Hawaii*, 992 F.3d 765, 773, 816 (9th Cir. 2021) (en banc) ("conclude[ing] that Hawai'i's restrictions on the open carrying of firearms reflect longstanding prohibitions and that the conduct they regulate is therefore outside the historical scope of the Second Amendment."). Rhode Island's prohibition of stun-gun possession thus fits in among "longstanding prohibitions" of weapons less deadly than firearms—prohibitions thought by the founding generation and other early Americans to be consistent with the Second Amendment's public meaning. *Heller*, 554 U.S. at 626, 634–35 ("Constitutional rights are enshrined with the scope they were understood to have when the people adopted them . . . ."). Section 11-47-42(a) is therefore a "presumptively lawful regulatory measure[]." *Id.* at 627 n.26.

The record evidence shows that stun guns are not in common use, not commonly used for self-defense, and therefore not protected by the Second Amendment. *Cf., e.g.*, *Kolbe*, 849 F.3d at 130 (concluding that "the banned assault weapons and large-capacity magazines are not constitutionally protected arms" (emphasis omitted)). The location of Rhode Island's stun-gun regulation also requires this conclusion. Plaintiffs' Second

Amendment challenge thus fails the first step of the First Circuit's two-step analysis. This Court need go no further and should grant Defendants summary judgment on this basis.

2. Assuming stun guns are protected by the Second Amendment, Section 11-47-42(a) would survive intermediate scrutiny.

Stuns guns are not protected by the Second Amendment. But if they were, this Court would need to "evaluate [Section 11-47-42(a)] under an appropriate level of scrutiny."[4] *Gould*, 907 F.3d at 670. "[T]he appropriate level of scrutiny turns on how closely a particular law or policy approaches the core of the Second Amendment right and how heavily it burdens that right." *Worman*, 922 F.3d at 36 (cleaned up). Courts, including the First Circuit, "have consistently recognized that *Heller* established that the possession of operative firearms for use in defense of the home constitutes the core of the Second Amendment." *Hightower v. City of Bos.*, 693 F.3d 61 (1st Cir. 2012) (quotation marks omitted); *see also McDonald*, 561 U.S. at 769 ("[*Heller*] found that this right applies to handguns because they

---

[4] Plaintiffs argue that this Court should strike down what they characterize as "Rhode Island's complete ban on electric arms" without resorting to a tiered-scrutiny analysis. Pls.' Mem. 9–11. This suggestion is misguided in at least three different ways: First, Section 11-47-42(a) is not a "complete ban on electric arms"; as discussed above, it only regulates stun guns. Second, the First Circuit has denied prior attempts to characterize similar regulations as class-wide bans: the *Worman* court explained that such attempts are "circular," amounting "to a suggestion that whatever group of weapons a regulation prohibits may be deemed a 'class,'" and that "[b]y this logic—which we squarely reject—virtually any regulation could be considered an 'absolute prohibition' of a class of weapons." 922 F.3d at 32 n.2. The final reason Plaintiffs' argument fails is that the First Circuit makes no exceptions to a tiered-scrutiny analysis at step-two of its Second Amendment analytical framework. *See Worman*, 922 F.3d at 32–33; *accord N.Y. Rifle & Pistol Assoc.*, 804 F.3d at 257 n.74 ("Plaintiffs' effort to avoid the two-step framework laid out here is unavailing. . . . *Heller* indicated that the typical 'standards of scrutiny' analysis should apply to regulations impinging upon Second Amendment rights . . . .").

are the most preferred firearm in the nation to keep and use for protection of one's home and family . . . ." (quotation marks omitted)).

After assuming but not deciding that semiautomatic assault weapons and large-capacity magazines were covered by the Second Amendment, the *Worman* court conducted this second-step of the Second Amendment inquiry, and decided that intermediate scrutiny was appropriate because the Massachusetts ban on these weapons and paraphernalia did not heavily burden the core Second Amendment right. *Worman*, 922 F.3d at 37. The burden was relatively light, the *Worman* court found, because the challenged law did not ban the entire class of semiautomatic weapons and magazines. *Worman*, 922 F.3d at 37. "Equally important" to its decision to apply intermediate scrutiny was "what the record d[id] not show: it offer[ed] no indication that the proscribed weapons have commonly been used for home self-defense purposes." *Id.*

Intermediate scrutiny is appropriate here. Like the law upheld in *Worman*, Section 11-47-42(a) does not ban the entire class of electric arms, only one its members: stun guns. Also as in *Worman*, and as pointed out in the previous section, there is no evidence in the record that stun guns are commonly used to defend the home. Section 11-47-42(a), moreover, allows Rhode Island citizens recourse to a vast array of weapons more commonly used for this purpose. *See Kolbe*, 849 F.3d at 130 (applying intermediate scrutiny to a statute that, like Section 11-47-42(a), "leaves citizens free to protect themselves with handguns and plenty of other firearms and ammunition").

Further militating in favor of intermediate scrutiny here is the fact that every federal appellate case to arrive at this step in the analysis—except for two panel cases subsequently

19

reversed en banc[5]—have chosen to apply intermediate scrutiny to the challenged regulation. *See N.Y. Rifle & Pistol Assoc.*, 804 F.3d at 260–61 (noting that "many [courts] have applied intermediate scrutiny to laws implicating the Second Amendment").

For a statute to survive intermediate scrutiny "there must be a reasonable fit between the restrictions imposed by the law and the government's valid objectives." *Worman*, 922 F.3d at 38 (quotation marks omitted); *N.Y. Rifle & Pistol Assoc.*, 804 F.3d at 261 (explaining that, under intermediate scrutiny, as long "as the defendants produce evidence that fairly supports their rationale, the laws will pass constitutional muster" (cleaned up)). This fit is present "so long as the regulation promotes a substantial governmental interest that would be achieved less effectively absent the regulation, and the means chosen are not substantially broader than necessary to achieve that interest." *Heller v. District of Columbia*, 670 F.3d 1244, 1258 (D.C. Cir. 2011) (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 782–83 (1989)). When determining the reasonableness of the fit, courts "start with the premise that [they] ought to give substantial deference to the predictive judgments of a state legislature engaged in the enactment of state laws." *Gould*, 907 F.3d at 673 (quotation marks omitted) ("This degree of deference forecloses a court from substituting its own appraisal of the facts for a reasonable appraisal made by the legislature."); *see also N.Y. Rifle & Pistol Assoc.*, 804 F.3d at 261 (noting that "state regulation of the right to bear arms has always been more robust than analogous regulation of other constitutional rights" (quotation marks omitted)).

---

[5] *Kolbe v. Hogan*, 813 F.3d 160, 182 (4th Cir. 2016), *overruled by*, 849 F.3d 114, 130 (4th Cir. 2017) (en banc); *Tyler v. Hillsdale Cty. Sheriff's Dep't*, 775 F.3d 308, 328–29 (6th Cir. 2014), *overruled by*, 837 F.3d 678, 692 (6th Cir. 2016) (en banc).

Courts have universally recognized that the governmental interests involved here—protecting public safety and preventing crime—are not just legitimate and important; they are compelling. *See, e.g.*, *Worman*, 922 F.3d at 39; *Gould*, 907 F.3d at 673 ("[F]ew interests are more central to a state government than protecting the safety and well-being of its citizens."); *N.Y. Rifle & Pistol Assoc.*, 804 F.3d at 263 (recognizing "the substantial deference [courts] owe to predictive judgments of the legislature on matters of public safety" (quotation marks omitted)).

These interests would no doubt be achieved less effectively absent Section 11-47-42(a). Stun guns are by no means harmless: the top selling stun gun at the online retailer giant Amazon.com, the SABRE S-1005, "emits an impressive 1.60 . . . [m]icrocoulombs charge" that is "powerful, producing 'intolerable pain' according to the National Institute of Justice." Amazon.com, Inc. *Sabre Self-Defense Kit* (attached as Ex. F); *see also* Amazon.com, Inc., *Best Sellers in Stun Guns* (attached as Ex. G). The next best-selling stun gun on Amazon is the VIPERTEK VTS-989-1, which boasts "ultra sharp spike electrodes" that penetrate thick clothing and, presumably, bare skin. Amazon.com, Inc., VIPERTEK VTS-989-1 Billion Heavy Duty Stun Gun (attached as Ex. H). Its manufacturer claims that "[s]imply touching" someone with this stun gun "will deliver a high voltage shock causing loss of balance and muscle control, confusion, and disorientation bringing him to his knees." *Id.*

Both the SABRE S-1005 and the VIPERTEK VTS-989-1 look like flashlights or television remotes. But there are now stun guns that are further disguised. *See* Guardian Self Defense, *Disguised Stun Guns*, https://www.guardian-self-

defense.com/collections/disguised-stun-guns (remarking on the "increased availability of disguised stun devices") (attached as Ex. I). These stun guns are purposely made to look like innocuous, everyday items such as a tube of lipstick, a keychain, a cell phone, a pen, and even an electronic cigarette. *Id.* TASERs, in comparison, have the shape of a traditional handgun. *See* Defs.' Produc. Resps. RI000148 (attached as Ex. J).

Noticing both stun guns' power to induce extreme pain and now their often deceivingly anodyne appearance, the Rhode Island legislature reasonably chose to protect public safety by prohibiting residents from possessing stun guns in the state. *Cf. Gould*, 907 F.3d at 676 ("This is plainly an inexact science, and courts must defer to a legislature's choices among reasonable alternatives."). Doing so prevents, among other things, children in the home from mistaking a stun gun for a toy (or a keychain, cellphone, et cetera) and hurting themselves or others. Section 11-47-42(a) also averts crime by, for example, preventing the possibility that a stun gun might be snuck into sporting events, airports, and other public places where weapons are prohibited, but where a bag check may not turn up a powerful weapon disguised as an office pen. Furthermore, this section does not "circumscribe in any way the fundamental right of law-abiding, responsible citizens to possess handguns in their homes for self-defense." *Worman*, 922 F.3d at 40.

Section 11-47-42(a) is a reasonable way to regulate stun guns, promote public safety, and prevent crime. Its reasonableness is all that is required under the Constitution to place it within "the legislature's prerogative . . . to weigh the evidence, choose among conflicting inferences, and make the necessary policy judgments." *Gould*, 907 F.3d at 676; *see Worman*, 922 F.3d at 40 (upholding law under intermediate scrutiny because "it strains credulity to

argue that the fit between [Massachusetts's assault-weapon and large-capacity-magazine ban] and the asserted governmental interest is unreasonable."); *Jackson v. City & Cty. of S.F.*, 746 F.3d 953, 969–70 (9th Cir. 2014) (noting that state and local governments "must be allowed a reasonable opportunity to experiment with solutions to admittedly serious problems." (quoting *City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 52 (1986)). This statute, if required to undergo it, would easily pass intermediate scrutiny.

\* \* \*

Upholding a similar regulation directed at assault weapons, Judge Easterbrook wrote for the Seventh Circuit that neither *McDonald* "nor *Heller* attempts to define the entire scope of the Second Amendment—to take all questions about which weapons are appropriate for self-defense out of the people's hands." *Friedman v. City of Highland Park*, 784 F.3d 406, 412 (7th Cir. 2015). And indeed Supreme Court precedent, as elucidated by the First Circuit, has not taken stun-gun regulation out of the hands of Rhode Islanders', that is, it has not vaulted stun guns to a hallowed position beyond public debate. "The central role of representative democracy is no less part of the Constitution than is the Second Amendment," Judge Easterbrook said in *Friedman*. *Id.* "[W]hen there is no definitive constitutional rule, matters are left to the legislative process." *Id.* To Plaintiffs' counter that stun guns are legal in most states, Judge Easterbrook provides an answer: "the Constitution establishes a federal republic where local differences are cherished as elements of liberty, rather than eliminated in a search for national uniformity. . . . Within the limits established by the Justices in *Heller* and *McDonald*, federalism and diversity still have a claim." *Id.*; *accord Gould*, 907 F.3d at 666 ("[E]ven though we recognize that the majority of Massachusetts communities have

23

firearms licensing policies that are more permissive than those adopted in Boston and Brookline, we do not regard those policies as relevant to our analysis.").

### III. CONCLUSION

Defendants ask that this Court reject Plaintiffs' call to constitutionalize stun guns, and that it retain the rightful place of federalism, diversity, and representative democracy in our constitutional order. Defendants respectfully request this Court to grant summary judgment in their favor because stun guns are unprotected by the Second Amendment, and even if they were, Section 11-47-42(a) survives intermediate scrutiny. Plaintiffs' motion for summary judgment should be denied for the same reasons.

Respectfully submitted,

DEFENDANTS,
in their official capacities only,

by

PETER F. NERONHA
ATTORNEY GENERAL

*/s/ Neil F.X. Kelly*
Neil F.X. Kelly #4515
Assistant Attorney General
150 South Main Street
Providence, RI 02903
(401) 274-4400 Ext: 2284
nkelly@riag.ri.gov

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I filed and served all counsel of record with a copy of the within document through the ECF filing system on this 7th day of May, 2021, and that it is available for viewing and downloading.

*/s/ Neil F.X. Kelly*_____