UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

_____
                                    )
MICHAEL P. O'NEIL;                  )
NICOLA GRASSO,                      )
                                    )
        Plaintiffs,                 )
                                    )
    v.                              )    C.A. No. 19-612 WES
                                    )
PETER F. NERONHA., in his           )
capacity as Attorney General;       )
JAMES M. MANNI, in his capacity     )
as Superintendent of the            )
Rhode Island State Police,          )
                                    )
        Defendants.                 )
_____)

**MEMORANDUM AND ORDER**

WILLIAM E. SMITH, District Judge.

Before the Court are Cross-Motions for Summary Judgment, ECF Nos. 30, 35, filed by Plaintiffs, Michael O'Neil and Nicola Grasso, and Defendants, Peter Neronha, in his capacity as Attorney General, and James Manni, in his capacity as Superintendent of the Rhode Island State Police. The parties ask the Court to resolve a Second Amendment constitutional challenge to the prohibition against stun guns set forth in R.I. Gen. Laws § 11-47-42(a)(1). For the reasons stated herein, the Court finds that the statute violates the Second Amendment to the United States Constitution. Therefore, Plaintiffs' Motion for Summary Judgment, ECF No. 30, is GRANTED, and

Defendants' Cross-Motion for Summary Judgment, ECF No. 35, is DE-
NIED.

   I.   BACKGROUND

   Plaintiffs Michael O'Neil and Nicola Grasso are Rhode Island
residents who wish to purchase, own, possess, and carry stun guns
for self-defense.   Pls.' Statement of Undisputed Facts ("Pls.'
SUF")  ¶¶ 1, 5, 6, 10, ECF No. 31.   These weapons are currently
prohibited by Rhode Island by General Law § 11-47-42(a)(1), which
provides:

> No person shall carry or possess or attempt to use
> against another any instrument or weapon of the kind
> commonly known as a blackjack, slingshot, billy,
> sandclub, sandbag, metal knuckles, slap glove, bludgeon,
> <u>stun-gun</u>, or the so called "Kung-Fu" weapons.

R.I. Gen. Laws § 11-47-42(a) (emphasis added).   On November 22,
2019, Plaintiffs filed a Complaint seeking a declaratory judgment
and injunctive relief for violation of 42 U.S.C. § 1983.   <u>See</u>
Compl. ¶¶ 82-90, ECF No. 1.   Plaintiffs allege that they are
entitled to such relief because "Defendants' laws, customs, prac-
tices and policies generally banning the acquisition, possession,
carrying and use of Tasers and other electronic arms violates the
Second Amendment to the United States constitution, facially and
as applied against the Plaintiffs."   <u>Id.</u> ¶ 83.

   The parties filed cross-motions for summary judgment address-
ing the constitutionality of the stun gun ban set forth in § 11-

47-42(a)(1).  <u>See generally</u> Pls.' Mem. in Supp. Mot. Summ. J. ("Pls.' Mem."), ECF No. 30-1; Defs.' Mem. in Supp. Mot. Summ. J. and Obj. to Pls.' Mot. Summ. J. ("Defs.' Mem."), ECF No. 35-1.  In the motions, the parties dispute: (1) the scope of the statute; (2) whether the arms regulated by § 11-47-42(a) are protected by the Second Amendment; (3) the appropriate level of scrutiny; and (4) the application of such scrutiny to the challenged statute. The Court takes each issue in turn.

   II.  LEGAL STANDARD

    "Summary judgment is appropriate where the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." <u>Lima v. City of East Providence</u>, 17 F.4th 202, 206 (1st Cir. 2021) (quoting <u>Audette v. Town of Plym-</u><u>outh</u>, 858 F.3d 13, 19 (1st Cir. 2017)).  "Cross-motions for summary judgment do not alter the summary judgment standard, but instead simply 'require [the Court] to determine whether either of the parties deserves judgment as a matter of law on the facts that are not disputed.'" <u>Wells Real Est. Inv. Tr. II v. Chardon/Hato Rey</u> <u>P'ship, S.E.</u>, 615 F.3d 45, 51 (1st Cir. 2010) (quoting <u>Adria Int'l</u> <u>Group, Inc. v. Ferré Dev., Inc.</u>, 241 F.3d 103, 107 (1st Cir.

2001)).  Where the parties have filed cross-motions "'simultane-
ously, or nearly so, the district court ordinarily should consider
the two motions at the same time,' applying the same standard."
Id. (quoting P.R. Am. Ins. Co. v. Rivera-Vásquez, 603 F.3d 125,
133 (1st Cir. 2010)).

   III. ANALYSIS

      A. Statutory Interpretation

   Before turning to the constitutional analysis, the Court must
briefly address the parties' dispute concerning the scope of the
prohibition in § 11-47-42(a).  In the Complaint, Plaintiffs allege
that § 11-47-42(a) bans both Tasers and stun guns because a Taser
can be used as a stun gun.  Compl. ¶ 58.  Plaintiffs also refer to
the term "other electronic arms" and specifically request a dec-
laration that the Court finds unconstitutional the "ban on electric
arms" in § 11-47-42.  Id. at 13, 14, 15.

   Defendants contend that such a ruling would extend beyond the
language of § 11-47-42(a) because the statute prohibits only "stun
guns," not Tasers or other types of electric arms.  Defs.' Mem. 9.
According to Defendants, this interpretation of the statute is
supported by its plain language, as well as the cannon of con-
struction "expression unius est exclusion alterius" or, in other
words, "the expression of one thing is the exclusion of other
things."  Id. at 7.  They argue that it would be improper to extend

the reach of the provision to an object not named in the statute but which can be deployed in the same manner. Id. at 7-8. Defendants also point to the definition of "firearms" under § 11-47-2(6) to demonstrate that the prohibition of stun guns in § 11-47-42(a) was not meant to extend to Tasers, which, they contend, the General Assembly intended to regulate as firearms.[1] Id. at 8. Each party argues that an alternative interpretation of the statute leads to absurd results. Defs.' Mem. 7; Pls.' Mem. in Supp. Reply and Obj. to Defs.' Cross-Mot. for Summ. J. ("Pls.' Reply") 2, ECF No. 39-1.

When interpreting a statute, the court "give[s] the words of the statute their plain and ordinary meanings." Epic Enters. v. Bard Grp., LLC, 186 A.3d 587, 590 (R.I. 2018) (quoting Alessi v. Bowen Ct. Condo., 44 A.3d 736, 740 (R.I. 2012)). The "ultimate goal is to give effect to the purpose of the act as intended by

---

[1] Pursuant to § 11-47-2(6), a "[f]irearm" includes:

[A]ny machine gun, pistol, rifle, air rifle, air pistol, "blank gun," "BB gun," or other instrument from which steel or metal projectiles are propelled, or that may readily be converted to expel a projectile, except crossbows, recurve, compound, or longbows, and except instruments propelling projectiles that are designed or normally used for a primary purpose other than as a weapon. The frame or receiver of the weapon shall be construed as a firearm under the provisions of this section.

R.I. Gen. Laws § 11-47-2(6).

the Legislature." Id. at 589-90 (quoting Webster v. Perrotta, 774 A.2d 68, 75 (R.I. 2001)).   To accomplish this task, the Court "looks to the statutory scheme as a whole, and examines the statute in context." Jerome v. Prob. Ct. of Barrington, 922 A.2d 119, 123 (R.I. 2007).   "'Literal' interpretations which lead to absurd results are to be avoided." Summit Inv. & Dev. Corp. v. Leroux, 69 F.3d 608, 610 (1st Cir. 1995).

Beginning with the language of the statute, Section 11-47-42(a) expressly bans possession of "stun guns" in addition to certain other enumerated weapons not at issue here. See § 11-47-42(a). The statute does not further define the term "stun gun" and also does not refer to other types of electric arms.[2] See id.

The parties agree that a Taser is more than a stun gun. See

---

[2] Defendants suggest that stun guns and Tasers are part of a "broader class of electric weapons that includes everything from cattle prods to high-energy lasers," citing an article produced by the Navy Surface Warfare Center. See Defs.' Statement of Undisputed Facts ("Defs.' SUF") ¶ 7, ECF No. 38; see also Defs.' Mem. in Supp. Mot. For Summ. J. and Obj. to Pls.' Mot. Summ. J.("Defs.' Mem.") Ex. B, at 50, ECF No. 35-2. Plaintiffs dispute this fact and argue that there is a distinction between electric arms available to civilians — stun guns and Tasers — and electric arms available only to the military. Pls.' Mem. in Supp. Reply and Obj. to Defs.' Cross-Mot. for Summ. J. ("Pls.' Reply") 6 n.7, ECF No. 39-1; Pls.' Statement of Disputed Facts ¶ 7, ECF No. 40. The Court considers Plaintiffs' argument regarding the scope of the statute to be limited to stun guns and Tasers, but to the extent that Plaintiffs request a ruling that the prohibition set forth in § 11-47-42(a) extends beyond such arms, such an interpretation

Defs.' Statement of Undisputed Facts ("Defs.' SUF") ¶¶ 1, 2, ECF No. 38.  A stun gun is a hand-held device, which "produce[s] an arc (spark) from one electrode to another to produce pain when contact is made with a person's flesh."[3]  Id. ¶ 1.  A Taser, on the other hand, is a "multi-function conducted-energy weapon[]" which is capable of propelling steel projectiles up to a certain distance, but which also has a secondary feature, known as "drive stun" mode, which allows the weapon to operate as a stun gun. Pls.' SUF ¶ 16; Defs.' SUF ¶¶ 2, 6.

Tasers are not included in the enumerated list set forth in § 11-47-42(a), nor are they specifically referenced in any other Rhode Island statute, including those relating to firearms. So while this weapon may fit the definition of firearm under § 11-47-2(6) because it functions as "an instrument from which steel or metal projections are propelled,"[4] see § 11-47-2(6), there can be

---

would not be supported by the plain language of the statute read in context.

[3] Plaintiffs do not challenge Defendants' proffered definitions of stun gun or Taser.  Rather, Plaintiffs take issue with Defendants' assertion that the projectiles of a Taser are expelled by means of an explosive.  See Pls.' Statement of Disputed Facts 1.

[4] The parties each point to advisory rulings or letters issued by the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") addressing whether Tasers are firearms under federal law. See Defs.' Mem. 8-9, ECF No. 35-1; Defs.' Mem. Exs. D, E, ECF No. 35-2; Pls.' Reply 3-4; Pls.' Reply Ex. 1, ECF No. 39-2.  These

little dispute that a Taser is effectively and operationally a stun gun while in "drive stun" mode. See Defs.' SUF ¶¶ 2, 6; Pls.' SUF ¶ 16.  As such, Plaintiffs convincingly argue that it would make no logical sense for the General Assembly to ban stun guns, but allow for a firearm to have an integrated stun gun feature which would allow it to avoid the statutory ban.  Pls.' Reply 4; see O'Connell v. Walmsley, 156 A.3d 422, 428 (R.I. 2017) ("[I]f a mechanical application of a statutory definition produces an absurd result or defeats legislative intent, th[e] [c]ourt will look beyond mere semantics and give effect to the purpose of the act."). Therefore, the Court interprets the prohibition on possession and carriage set forth in § 11-47-42(a) to include both stun guns and Tasers.[5]

B. Second Amendment Analysis

The Second Amendment provides: "[a] well regulated Militia,

---

exhibits demonstrate that this classification has perhaps changed with different models of Tasers.  See Defs.' Mem. Exs. D, E; Pls.' Reply Ex. 1.  In any event, the Court does not find that such evidence demonstrates the General Assembly's intent not to prohibit Tasers under § 11-47-42(a).

[5]  This holding should not be interpreted to suggest that a Taser would not be subject to regulation as a firearm based on its projectile functionality.  See § 11-47-2(6).  The Court takes no position on that issue.  Rather, the Court merely holds that the integrated "stun gun" feature found in all Tasers causes it to be subject to the stun gun prohibition in § 11-47-42(a).

being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II.  In <u>District of Columbia v. Heller</u>, 554 U.S. 570, 592, 628-29 (2008), the Supreme Court rejected as unconstitutional a prohibition against handguns in the home, holding that the Second Amendment right to keep and bear arms applies to an individual unconnected to militia service[6]; and, the Court held, "the inherent right of self-defense has been central to the Second Amendment right." <u>Heller</u>, 554 U.S. at 628.[7]

---

[6]  The Court made clear that the Second Amendment applies to the states through the Fourteenth Amendment in <u>McDonald v. City of Chicago</u>, 561 U.S. 742, 750 (2010).

[7] This holding is the law of the land and binding on this Court.  But as the historian Joseph Ellis describes in the book <u>American Dialogue: The Founders and Us</u>, this conclusion is not historically accurate, nor defensible as an example of Constitutional "originalism."  Joseph Ellis, <u>American Dialogue: The Founders and Us</u> 160-70, 2018.  Rather, Justice Scalia's majority opinion is a much better example of judicial activism or "living constitutionalism" in as much as it reflected public sentiment dressed up in "law-office history."  <u>Id.</u> at 163-68.  As Ellis writes:

> This collision between Scalia's originalist convictions and his political agenda helps explain why his opinion in <u>Heller</u> is so difficult to follow, indeed seems almost designed to create a maze of labyrinthian pathways that crisscross, then double back on one another like a road map through <u>Alice in Wonderland</u>.  For Scalia was committed to providing an originalist reading of a historical document whose words and historical context defied the conclusion he was predisposed to reach.  If <u>Heller</u>

The Court in Heller did not examine "the full scope of the Second Amendment" but emphasized that the right "is not unlimited."[8]  554 U.S. at 626.  More specifically, it instructed that "nothing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws

----

reads like a prolonged exercise in legalistic legerdemain, or perhaps a tortured display of verbal ingenuity by an overly assiduous Scrabble player, that is because Scalia's preordained outcome forced him to perform three challenging tasks: to show that the words of the Second Amendment do not mean what they say; to ignore the historical conditions his originalist doctrine purportedly required him to emphasize; and to obscure the radical implications of rejecting completely the accumulated wisdom of his predecessors on the court.

Id. at 165.

[8]  Eight years after District of Columbia v. Heller, 554 U.S. 570 (2008), the Supreme Court vacated a judgment of the Supreme Judicial Court of Massachusetts upholding a ban against the possession of stun guns.  Caetano v. Massachusetts, 577 U.S. 411, 412 (2016).  The majority opinion in Caetano was narrow and did not address the constitutionality of such a prohibition.  Id.  Instead, it held that "the explanation the Massachusetts court offered for upholding the law contradicts [Supreme Court] precedent."  Id. More specifically, the Court rejected as inconsistent with Heller the Supreme Judicial Court's findings that stun guns are not protected by the Second Amendment because they (1)  were not in existence when the Second Amendment was ratified; (2) are unusual because they are a modern invention; and (3) are not useful for military purposes.  Id.

imposing conditions and qualifications on the commercial sale of arms." Id. at 626–27.

Post-Heller, the First Circuit has "mapped out a two-step approach for analyzing Second Amendment challenges." Worman v. Healy, 922 F.3d 26, 33 (1st Cir. 2019). First, the Court must "ask whether the challenged law burdens conduct that is protected by the Second Amendment." Id. If it does, then the Court "must determine what level of scrutiny is appropriate and must proceed to decide whether the challenged law survives that level of scrutiny." Id. at 33 (quoting Gould v. Morgan, 907 F.3d 659, 669 (1st Cir. 2018)).

### 1. Scope of the Second Amendment Right

The Court's first inquiry "is 'backward-looking' and 'seeks to determine whether the regulated conduct was understood to be within the scope of the right at the time of ratification.'" Worman, 922 F.3d at 33 (quoting Gould, 907 F.3d at 669). However, "[t]hat the proscribed weapons were not in existence, let alone in common use, at the time of ratification, does not end the matter." Id. at 34. Therefore, to answer this first prong, the Court analyzes "whether the proscribed weapons are in common use for lawful purposes like self-defense." Id. at 35.

11

a. Presumption

The parties dispute who should bear the burden of demonstrating that stun guns are (or are not) within the scope of Second Amendment protection.  Plaintiffs argue that stun guns fall within the definition of "arms" contemplated in Heller, which creates a rebuttable presumption in favor of Second Amendment protection. Pls.' Mem. 4-5 (citing N.Y. State Rifle & Pistol Ass'n v. Cuomo, 804 F.3d 242, 257 (2d Cir. 2015) ("NYSRPA")).  Therefore, Plaintiffs argue, it is the Defendants' burden to prove that stun guns do not receive constitutional protection.  Pls.' Reply at 5.  Defendants counter that Heller did not "creat[e] a presumption that all duly enacted arms regulation is constitutionally infirm." Defs.' Reply Mem. Supp. Mot. for Summ. J. & Obj. to Pls.' Mot. ("Defs.' Reply") 6, ECF No. 42.  Rather, citing to Hollis v. Lynch, 827 F.3d 436, 447 (5th Cir. 2016), Defendants say that the presumption to which Plaintiffs refer "never kicks in because stun guns are not in common use and not commonly used for lawful purposes."  Id. at 6-7.  Defendants argue that the only presumption that matters in this case is that a duly enacted statute is presumed to be constitutional.  Id. at 7.

To begin, there is little question that stun guns fall within the definition of "arms" under the Second Amendment.  See Heller, 554 U.S. at 581 (quoting the 1771 legal definition of arms found

12

in 1 Timothy Cunningham, A New and Complete Law Dictionary) (defining "arm", understood at the time of ratification, to be "any thing that a man wears for his defence, or takes into his hands, or useth in wrath to cast at or strike another"); Ramirez v. Commonwealth, 94 N.E.3d 809, 815 (Mass. 2018) ("Having received guidance from the Supreme Court in Caetano II, we now conclude that stun guns are 'arms' within the protection of the Second Amendment.").

As to whether this creates a rebuttable presumption in favor of Second Amendment protection, the answer is less clear. In Heller, the Supreme Court rejected the argument that the Second Amendment extends only to arms in existence in the 18th century, holding instead that "the Second Amendment extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding." 554 U.S. at 582.

The First Circuit has not specifically addressed this question, but several other circuits have held that the government has the burden to show that an arm falls outside the scope of Second Amendment protection. NYSRPA, 804 F.3d at 257 n.73 (holding that Heller "identifies a presumption in favor of Second Amendment protection, which the State bears the initial burden of rebutting"); Ezell v. City of Chicago, 651 F.3d 684, 702-03 (7th Cir. 2011)

13

(emphasis added) ("[I]f the government can establish that a challenged law regulates activity falling outside the scope of the Second Amendment right as it was understood at the relevant historical moment — 1791 or 1868 — then the analysis can stop there; the regulated activity is categorically unprotected, and the law is not subject to further Second Amendment review."); Tyler v. Hillsdale Cnty. Sheriff's Dept., 837 F.3d 678, 685-86 (6th Cir. 2016) (placing burden on government to demonstrate that the law regulates conduct outside the scope of the second amendment); Miller v. Bonta, 542 F. Supp. 3d 1009, 1029 (S.D. Cal. 2021) ("The correct starting orientation is that no arm may be prohibited. If a plaintiff challenges the government's prohibition, it is on the government first to prove the banned arm is dangerous and unusual, and if not that it is not commonly possessed, or not commonly possessed by law-abiding citizens, or not commonly possessed for lawful purposes or militia readiness."). But see Hollis, 827 F.3d at 447 ("There is no prima facie case . . . when the weapon is not one 'in common use at the time,' 'possessed at home,' and for 'lawful purposes like self-defense.'"). Mindful of the holdings of Heller, and consistent with the decisions cited above, the Court concludes the presumption of Second Amendment coverage applies; therefore, in order for the Court's analysis to end at step one, the State must show that stun guns are not within the scope of the

14

Second Amendment.

### b. Common Use for Lawful Purposes

The relevant question for the Court is "whether the proscribed weapons are in common use for lawful purposes like self-defense." Worman, 922 F.3d at 35.   Turning first to common use, "Heller provides only meager guidance" on this question.   Id. ("[A]s to the middle ground—and particularly, as to how to plot the dividing line between common and uncommon use—the Court was silent."); see Heller, 554 U.S. at 627 (holding that "the sorts of weapons pro-tected [by the Second Amendment] were those 'in common use at the time'").   Generally, the common use inquiry involves a statistical analysis.   NYSRPA, 804 F.3d at 256 ("'[C]ommon use' is an objective and largely statistical inquiry . . . .").   However, "there is considerable variety across the circuits as to what the relevant statistic is and what threshold is sufficient for a showing of common use."   Hollis, 827 F.3d at 449.   Indeed, in Hollis, the Fifth Circuit Court of Appeals lists a "wide variety in methodo-logical approaches" including "raw number, percentage and propor-tion, [and] jurisdiction-counting."   Id.; see NYSRPA, 804 F.3d at 255 (holding that large capacity magazines were in common use where 50 million units were available for purchase); Friedman v. City of Highland Park, 784 F.3d 406, 409 (7th Cir. 2015) (noting that "9% of the nation's firearms owners have assault weapons").   A weapon

is not "'in common use' if it is 'dangerous and unusual.'"[9]  <u>Hollis</u>, 827 F.3d at 447.

The First Circuit has not provided definitive guidance for this inquiry, but has suggested that "measuring 'common use' by the sheer number of weapons lawfully owned is somewhat illogical." <u>Worman</u>, 922 F.3d at 35 n.5 (quoting <u>Friedman</u>, 784 F.3d at 409) ("[I]t would be absurd to say that the reason why a particular weapon can be banned is that there is a statute banning it so it isn't commonly owned.").  Indeed, many courts have discussed the difficulty in applying this factor of the test.  <u>See</u> <u>Avitabile v. Beach</u>, 368 F. Supp. 3d 404, 411 (N.D.N.Y. 2019) ("[T]rial courts have expressed frustration about the difficulty of meaningfully evaluating 'common use.'"); <u>Maloney v. Singas</u>, 351 F. Supp. 3d 222, 237 n.25 (E.D.N.Y. 2018) ("The virtual impossibility of the

_____

[9] How the "dangerous and unusual" test fits within the common use factor remains unclear.  <u>See</u> <u>Kolbe v. Hogan</u>, 849 F.3d 114, 135-36 (4th Cir. 2017) (listing several questions raised in light of <u>Heller</u>, including "Is not being 'in common use at the time' the same as being 'dangerous and unusual'?", but holding that the court need not answer those questions).  Several circuits have held that weapons like machine guns and sawed-off shotguns are sufficiently dangerous to fall outside the scope of the Second Amendment.  <u>See</u> <u>United States v. Henry</u>, 688 F.3d 637, 640 (9th Cir. 2012) (finding a machine gun dangerous because it "allow[s] a shooter to kill dozens of people within a matter of seconds"); <u>United States v. Marzzarella</u>, 614 F.3d 85, 95 (3d Cir. 2010) (noting dangerousness of a sawed-off shotgun).  Defendants have not argued dangerousness at the first step of this inquiry.

task itself convinces the Court that common use cannot be a relevant, and certainly not the only relevant, criterion under <u>Heller</u>.").

For their part, Plaintiffs provide four declarations from stun gun sellers describing the number of stun gun sales across the United States for more than a decade.  <u>See</u> Pls.' Mem. Ex. C, ECF No. 30-4.  According to these declarations, approximately 6.5 million stun guns have been sold to consumers between 2008 and 2020.[10]  <u>See</u> <u>id.</u>; <u>see also</u> Pls.' SUF ¶ 15.

While Defendants agree that millions of stun guns have been sold nationwide, they argue that "however defined," stun guns are not in common use.  Defs.' Mem. 14.  As an example, Defendants

---

[10]  Defendants suggest that this total number may be misleading in that it could include other types of electric arms.  Defs.' Mem. 12-13.  They point out that only one of the declarations specifies that the sale amount does not include Tasers.  <u>Id.</u>; <u>see</u> Pls.' Mem. in Supp. Mot. Summ. J.  Ex. C., ECF No. 30-4.  Based on this declaration, Defendants assert in their statement of facts that "[a]pproximately 1.9 million stun guns have been sold in the United States to date."  Defs.' SUF ¶ 9.  While Defendants are correct that only one of the declarations specifically notes the exclusion of Tasers, there is no indication that each of the other three declarations, which address sales of "stun guns", use this term to mean the broader category of electric arms.  In any event, this dispute does not rise to the level of a genuine issue of material fact, both because the Court has determined that § 11-47-42(a) also prohibits Tasers, and its conclusion remains if the total number of stun gun sales equals approximately 1.9 million.  Defs.' SUF ¶ 9.

point to the dictionary definition of the term "common" and suggest that televisions or cell phones are in common use, but 6.5 million stun guns owned by less than one percent of the United States population, are not.  Id. at 13.  Primarily, however, Defendants urge the Court to use handguns as a measuring stick for its statistical analysis.  See Defs.' Mem. 11-14.  Defendants contend that the ratio of handguns to stun guns is more than 25 to 1 and assert that "the number of stun guns is dwarfed" by the amount of firearms owned in this country.  Id. at 13.

Concurring in Caetano v. Massachusetts, Justice Alito, joined by Justice Thomas, rejected a similar line of reasoning. See 577 U.S. 411, 420 (2016) (Alito, J., concurring).  Justice Alito wrote that the statistical gap between the number of stun guns or Tasers and firearms "may be true, but it is beside the point."  Id.  This is because if it were "[o]therwise, a State would be free to ban all weapons except handguns, because 'handguns are the most popular weapon chosen by Americans for self-defense in the home.'"  Id. (quoting Heller, 554 U.S. at 629).  Justice Alito went on to say that "[t]he more relevant statistic is that '[h]undreds of thousands of Tasers and stun guns have been sold to private citizens,' who it appears my lawfully possess them in 45 states." Id. (quoting People v. Yanna, 824 N.W.2d 241, 245 (Mich. Ct. App. 2012)).

Furthermore, at least two other courts have found stun guns

to be in common use.  See Avitabile, 368 F. Supp. 3d at 411-12 (finding that at least 300,000 TASERs and 4,478,330 stun guns satisfied a finding of common use); Yanna, 824 N.W.2d at 245 (noting that stun guns and TASERs are legal in 43 states and although less popular than handguns, may not "fairly be labeled as unusual weapons").  Based on the record and the persuasive caselaw from other jurisdictions, the Court finds that stun guns are in common use for purposes of this step of the Second Amendment inquiry.

Second, just as with common use, "there is no defined analytical standard" for assessing whether an arm is typically possessed for lawful purposes.  Avitabile, 368 F. Supp. 3d at 412 (quoting Maloney, 351 F. Supp. 3d at 234-35).  The Second Circuit has suggested that courts should "look into both broad patterns of use and the subjective motives of . . . owners."  NYSRPA, 804 F.3d at 256.

On this point, Plaintiffs argue that only twelve arrests relating to stun gun usage in Rhode Island have occurred from 2005 to present, Pls.' Mem. 7, while Defendants contend that incident reports dating back twenty years lack any reference to a stun gun being used in self-defense, Defs.' Mem. 14.  Without question, the evidence in the record relating to typical use or possession is quite limited.  But it is Defendants' burden to demonstrate that stun guns are not used for lawful purposes such as self-defense,

and they failed to do so.  Therefore, this factor cuts in favor of Plaintiffs.

Other courts have reached similar conclusions.  In Yanna, the Michigan Court of Appeals rejected the state's argument that "stun guns are not suited for lawful defensive purposes and . . . can easily be use for torturing someone."  824 N.W.2d at 244.  The court stated that "[o]ne could easily produce an even lengthier list of criminal cases involving handguns, but the Supreme Court has determined that handguns are within the ambit of the Second Amendment."  Id. at 244-45.  The court concluded that the govern-ment "fail[ed] to put forth evidence that would give the Court reason to doubt that the vast majority of Tasers and stun guns are possessed by law-abiding citizens for lawful purposes."  Id. at 245.

Similarly, in Avitabile, the district court found that the state had not rebutted the presumption that stun guns are typically used for lawful purposes.  368 F. Supp. 3d at 412.  While the court stated that electric arms "are sometimes used in connection with criminal activity," it found that "there is no indication that [T]asers or stun guns have some sort of 'special propensity for unlawful use.'"  Id. (quoting Maloney, 351 F. Supp. 3d at 236).  The court also found relevant that "forty-seven states now permit the use and possession of electric arms with or without some form

20

of attendant regulation."   Id.

In sum, Defendants have failed to demonstrate that stun guns are not in common use or not typically possessed for lawful purposes like self-defense.

### c. Longstanding Prohibition

Finally, Defendants argue that even if stun guns are sufficiently common and typically possessed for lawful purposes, the Court's analysis should nevertheless end at step one because the prohibition of stun guns is "longstanding" and presumed to be lawful under Heller given that the Rhode Island General Assembly added "stun gun" to a list of prohibited weapons first enacted in 1896.  Defs.' Mem. 16–17 (citing Young v. Hawaii, 992 F.3d 765, 773 (9th Cir. 2021)); Defs.' Reply 10.

"[A] regulation 'does not burden conduct protected by the Second Amendment if the record contain[s] evidence that [the subjects of the regulations] have been the subject of longstanding, accepted regulation.'"   Young, 992 F.3d at 783 (quoting Fyock v. Sunnyvale, 779 F.3d 991, 997 (9th Cir. 2015)); see Heller, 554 U.S. at 626–27, 627 n.26 (holding that certain "longstanding prohibitions" relating to firearms are "presumptively lawful," including, but not limited to, "possession of firearms by felons and the mentally ill, . . . laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, . .

. [and] laws imposing conditions and qualifications on the commercial sale of arms"). To answer this question, a court looks for "historical prevalence" or if the law falls within those categories of laws specifically set forth in Heller. Young, 992 F.3d at 783. But it is worth noting that "[t]he Supreme Court has not created a test for determining whether a regulation is longstanding" and "'few lines from [Heller] have been more controversial or consequential' than its passage discussing presumptively lawful regulations." Nat'l Rifle Ass'n of Am., Inc. v. Swearingen, 545 F. Supp. 3d 1247, 1261-62 (N.D. Fla. 2021).

Here, the prohibition of stun guns in § 11-47-42(a) does not fall within the enumerated list of "presumptively lawful" regulations in Heller. See Heller, 554 U.S. at 626-27. Defendants contend, however, that the stun gun regulation is "consistent with—and indeed located within—" a regulation that could be considered presumptively lawful because it bans other small weapons that have been historically prohibited. Defs.' Reply 10. In Young, the Ninth Circuit recently remarked that bans of "small, hand-held weapons, capable of being concealed, including pistols, revolvers, dirks, daggers, brass knuckles, and slung shots" were among the earliest laws predating the constitution. See 992 F.3d at 784-86, 816 (ultimately holding that Hawaii's restriction on open carrying of firearms is a longstanding prohibition outside the scope

of the Second Amendment).   Section 11-47-42(a) includes bans against possession of "slingshot[s]," "metal knuckles," "dirks," and "daggers."

However, while stun guns may have some similar characteristics to some of the historical weapons enumerated in § 11-47-42(a), including that a few these weapons are small and some typically non-lethal, Defendants have not presented any evidence demonstrating the historical prevalence of prohibiting stun guns. See United States v. Rene E., 583 F.3d 8, 12 (1st Cir. 2009) (finding a longstanding tradition of prohibiting juveniles from possessing handguns after analyzing contemporary and nineteenth century laws "imposing similar restrictions").   This Court will not extend such a Second Amendment limitation solely based on the addition of the stun gun to a list of arm prohibitions dating back to 1896.   See United States v. Marzzarella, 614 F.3d 85, 94 (3d Cir. 2010) ("[P]rudence counsels caution when extending these recognized exceptions to novel regulations unmentioned by Heller."). Therefore, the prohibition against the possession of stun guns in § 11-47-42(a) is not presumptively lawful.

Accordingly, like the other courts to have addressed this question, this Court finds that stun guns constitute arms within the protection of the Second Amendment.

23

### 2. Level of Scrutiny and Application

At the second step of the analysis, the Court "must determine what level of scrutiny is appropriate and must proceed to decide whether the challenged law survives that level of scrutiny." Worman, 922 F.3d at 33 (quoting Gould, 907 F.3d at 669).  Plaintiffs argue that the Court need not apply any tier of scrutiny to find the ban on stun guns unconstitutional.  Pls.' Mem. 9.  Instead, they say, the Court should employ a categorical approach because the prohibition implicates possession of arms in the home. Id.  In the alternative, Plaintiffs argue that strict scrutiny should apply for a similar reason — because the ban severely burdens the core Second Amendment right to self-defense inside the home.  Id. at 12.  Defendants, on the other hand, argue that intermediate scrutiny applies because the statute prohibits only one type of electric arm (stun guns) and that Rhode Island law allows for possession of other weapons more traditionally used to protect the home.  Defs.' Mem. 19.  Defendants also assert that nearly every other federal appellate court has applied intermediate scrutiny to the challenged statute.  Id. at 19-20.

"[T]he appropriate level of scrutiny must turn on how closely a particular law or policy approaches the core of the Second Amendment right and how heavily it burdens that right."  Gould, 907 F.3d at 670-71.  "A law or policy that burdens conduct falling

within the core of the Second Amendment requires a correspondingly strict level of scrutiny, whereas a law or policy that burdens conduct falling outside the core of the Second Amendment logically requires a less demanding level of scrutiny." Id. at 671.   In Gould, the First Circuit explicitly held "that the core Second Amendment right is limited to self-defense in the home."[11] Id. at 671.   "[O]utside the home, firearm rights have always been more limited, because public safety interests often outweigh individual interests in self-defense." Id. at 672 (quoting United States v. Masciandaro, 638 F.3d 458, 470 (4th Cir. 2011)).   In Worman, the First Circuit clarified that intermediate scrutiny is appropriate even if the challenged legislation "implicates the core Second Amendment right to self-defense in the home," so long as the act "places only a modest burden on that right."  922 F.3d at 38.

Plaintiffs' first argument is dispatched easily.  While it is true that some courts have found bans on the possession of stun guns to be unconstitutional without applying any form of scrutiny, see Illinois v. Webb, 131 N.E.3d 93, 98 (Ill. 2019); Ramirez, 94 N.E.3d at 815; Yanna, 824 N.W. 2d at 246, the First Circuit has made clear that once a finding is made that challenged conduct is

---

[11]   The Court in Gould v. Morgan, 907 F.3d 659, 671 (1st Cir. 2018), also noted that "some courts have formulated broader con-ceptions of the core of the Second Amendment."

protected by the Second Amendment, this Court is "require[d] . . . to evaluate the [law] under an appropriate level of scrutiny." Worman, 922 F.3d at 36 (quoting Gould, 907 F.3d at 670).  Furthermore, in Worman, the First Circuit strongly suggested that employing a categorical approach would not be appropriate in this context.  See id. at 38 n.6 (citing Webb, 131 N.E.3d at 98) (disagreeing with "the Illinois Supreme Court's conclusion that any law that restricts a certain type of arms is per se unconstitutional").

So, the question becomes whether strict or intermediate scrutiny should apply.  For starters, the blanket ban on possession of stun guns in § 11-47-42(a) extends into the home and therefore implicates the core Second Amendment right.  See Gould, 907 F.3d at 671; Worman, 922 F.3d at 36 (assuming that a ban on large capacity magazines and semi-automatic weapons implicated the core Second Amendment right where plaintiffs argued it "affect[ed] their ability to defend themselves in their homes").

But the more difficult question relates to how heavily § 11-42-47(a) burdens this core right.  Gould, 907 F.3d at 670-71.  In deciding that a restriction on large capacity magazines and certain semiautomatic assault weapons did not heavily burden the core right, the First Circuit in Worman highlighted the following critical factors: (1) the challenged statue "proscribes only a set of

26

specifically enumerated . . . weapons"; (2) the prohibited weapons "do not share the features that make handguns well-suited to self-defense in the home"; (3) the lack of record evidence that semi-automatic assault weapons had been commonly used in the home for such purposes; and (4) the weapons at issue "implicate[] the safety of the public at large" because they are capable of "fir[ing] through walls, risking the lives of those in nearby apartments or on the street."  922 F.3d at 37.

Here, the parties' arguments primarily relate to the scope of the ban.  Plaintiffs argue that § 11-47-42(a) effectively amounts to a complete ban on electric arm possession, and even if the Court considers the provision more narrowly to exclude Tasers, "[s]tun guns constitute the vast majority of electric arms."  Pls.' Reply 11.  They also add that stun guns have many of the characteristics that would render these weapons preferable for defense of the home. See Pls.' Reply 11-12.  Defendants, in contrast, argue that, as in Worman, the law only bans one member of a larger class of electric arms and there is no record evidence demonstrating that stun guns are commonly used for self-defense.  Defs.' Mem. 19; Defs.' Reply 11.

To be sure, some of the important considerations in Worman are not present here.  For example, a stun gun does not "impli-cate[] the safety of the public at large" in the same way that a

27

semiautomatic weapon does, because a stun gun is only effective at close range.  Worman, 922 F.3d at 37; See Defs.' SUF ¶ 1 (noting that the stun gun operates when "contact is made with a person's flesh").  Additionally, unlike in Worman, where the Court of Appeals commented that "wielding the proscribed weapons for self-defense within the home is tantamount to using a sledgehammer to crack open the shell of a peanut," stun guns have some features similar to handguns — i.e. smaller size and ease of use—helpful for self-defense.  922 F.3d at 37.

Most courts analyzing Second Amendment challenges apply intermediate scrutiny.  See NYSRPA, 804 F.3d at 260-61; Marzzarella, 614 F.3d at 97; see also Worman, 922 F.3d at 38 ("This holding aligns us with a number of our sister circuits, which have applied intermediate scrutiny to laws restricting semiautomatic assault weapons and LCMs.").  Because the law does not survive even the less rigorous level of intermediate scrutiny, the Court will assume without deciding that this is the appropriate level of scrutiny to be applied.

"To survive intermediate scrutiny, a statute 'must be substantially related to an important governmental objective.'" Worman, 922 F.3d at 38 (quoting Gould, 907 F.3d at 672).  "To achieve this substantial relationship, there must be a 'reasonable

fit' between the restrictions imposed by the law and the government's valid objectives, 'such that the law does not burden more conduct than in reasonably necessary.'"   Id. (quoting Gould, 907 F.3d at 674).

Defendants argue that the government has an interest in "protecting public safety and preventing crime" and that "[t]hese interests would no doubt be achieved less effectively absent Section 11-47-42(a)."   Defs.' Mem. 21.   They contend that stun guns are not harmless and are capable of being disguised or mistaken for other harmless items by children.   Id. at 21-22.   Defendants also argue that the state "is not required to use the least restrictive means to achieve its compelling state interests."   Defs.' Reply 13.

Plaintiffs retort that there is no reasonable fit between the ban and public safety because it bars possession by all citizens, not just individuals with criminal records or minors, Pls.' Mem.16; that it makes no sense to ban electric arms that are non-lethal, particularly when handguns are allowed under Heller, Pls.' Reply 13; and that Defendants have not demonstrated that "disguised" stun guns are a real problem, relying as they do on hypotheticals to show the statute is narrowly tailored.   Id. at 14.

"[F]ew interests are more central to state government than protecting the safety of and well-being of its citizens."   Worman,

29

922 F.3d at 39 (quoting Gould, 907 F.3d 673).  The critical question here is "whether the fit between those interests and the [challenged statute] is reasonable."  Id.  When analyzing this issue, the Court "start[s] with the premise that courts ought to give 'substantial deference to the predictive judgments' of a state legislature engaged in the enactment of state law."  Gould, 907 F.3d at 673 (quoting Turner Broad. Sys., Inc. v. FCC, 520 U.S. 180, 195 (1997)).  "This degree of deference forecloses a court from substituting its own appraisal of the facts for a reasonable appraisal made by the legislature."  Id.  But deference "should not be confused with blind allegiance."  Id. at 673-72.

First, the statute at issue here may be distinguished from the provisions found constitutional under intermediate scrutiny in Worman and Gould in critical respects.  In Worman, the challenged law "d[id] not ban the sale, transfer, or possession of all semi-automatic weapons [or] impose any restrictions on magazines that are designed to hold ten rounds or fewer."  922 F.3d at 39.  In Gould, the First Circuit found important that the firearm licensing statute, which allowed officials to issue a license to publicly carry firearms if certain qualifications were met, did not equate to a "total ban on the right to public carriage of firearms" and could be handled on a "case by case" basis.  907 F.3d at 674.

30

Here, § 11-47-42(a), under its plain terms, imposes a <u>complete</u> stun gun ban.

Second, the record does not indicate that there are "unique dangers posed by the proscribed weapons," as there were for semi-automatic weapons. <u>Worman</u>, 922 F.3d at 39; <u>see</u> <u>Teter v. Connor</u>, 460 F. Supp. 3d 989, 1006 (D. Hawaii 2020) (noting "reliable evidence that butterfly knives are closely associated with crime and popular with minors and gang members"). Although defendants suggest that the ability to disguise stun guns as other household items poses a challenge for state regulation or particular danger to children, the record is devoid of evidence demonstrating the real-world existence of this problem.[12] <u>See</u> <u>Ezell</u>, 651 F.3d at 690 ("[T]he City produced no empirical evidence whatsoever and rested its entire defense of the range ban on speculation . . . ..").

Moreover, defendants have provided the Court with no evidence demonstrating that the complete ban of these weapons lessens the adverse outcomes the State seeks to prevent. <u>See</u> <u>Gould</u>, 907

---

[12] Certainly, this is not to say that such weapons are not at all dangerous. <u>See</u> <u>Avitabile v. Beach</u>, 368 F. Supp. 3d 404, 419 (N.D.N.Y. 2019) (noting that "stun guns are not children's toys, and might be dangerous in the wrong hands"). "But as <u>Heller</u> and its progeny make clear, the fact that a class of arms entitled to Second Amendment protection <u>might</u> be dangerous in the wrong hands (e.g., handguns) does not necessarily justify their blanket ban in all settings." <u>Id.</u>

F.3d at 675 (citing studies provided by defendants showing corre-
lation between restrictive firearm licensing schemes and crime or
gun violence).  In fact, common sense suggests the opposite may
well be true.  See Avitabile, 368 F. Supp. 3d at 420 (suggesting
that a ban on stun gun increases the potential for injury and crime
because it may encourage individuals to buy handguns for protection
instead).

Therefore, while the Court is mindful that it should "cede
some degree of deference" to the General Assembly about "how best
to regulate the possession and use of the proscribed weapons," see
Worman, 922 F.3d at 41, the deference is not unlimited.  See
Maloney, 351 F. Supp. 3d at 239 (holding a ban of nunchaku uncon-
stitutional under intermediate scrutiny where the record lacked
evidence of nunchaku-related crime and the state "offered virtu-
ally no evidence supporting a public safety rational for a total
ban (as opposed to lesser restrictions) on the possession and use"
of the weapon).  In the absence of virtually any evidence to
support the State's claim of its interests, a complete ban on stun
guns cannot survive a Second Amendment challenge.  The total ban
of stun guns contained in R.I. Gen. Laws § 11-47-42(a)(1) clearly
lacks the required "substantial" fit between the asserted govern-
mental interest and the means chosen to advance those interests,
and accordingly, violates the Second Amendment.

32

IV.   CONCLUSION

For the reasons stated herein, Plaintiffs' Motion for Summary Judgment, ECF No. 30, is GRANTED and Defendants' Motion for Summary Judgment, ECF No. 35, is DENIED.   The prohibition against the possession and use of stun guns set forth in § 11-47-42(a) is an unconstitutional restriction of the right to bear arms under the Second Amendment in light of <u>Heller</u>.   Consequently, Judgment shall enter in favor of Plaintiffs.   Defendants are PERMANENTLY ENJOINED from enforcing § 11-47-42(a) as related to stun guns.

IT IS SO ORDERED.

William E. Smith
District Judge
Date: March 15, 2022